[No. F002466. Fifth Dist. June 4, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
NELSON J. ROSCOE, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Harvey R. Zall, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Roger E. Venturi and Anthony L. Dicce, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TUTTLE, J.**\*—Defendant appeals from his March 9, 1983, conviction (following a jury trial) of violation of Penal Code sections 288a, subdivision (b)(2) (oral copulation with a person under 16) and 286, subdivision (b)(2) (sodomy with a person under 16).

The sole question before us is whether or not the trial court violated the rule of *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], in permitting the jury to hear Dr. Cotton, a clinical psychologist, give his diagnosis of the complaining witness as a victim of child molestation. We hold the court erred, but affirm the judgment because it is not reasonably probable that exclusion of the evidence would have resulted in a different verdict.

### STATEMENT OF FACTS

In 1981, the victim, James H., was 15 years old and lived with his parents in Bakersfield, California. The following summary is based largely upon James' testimony. During the summer of his 15th year, he struck up a relationship with appellant who was his neighbor. The relationship began when James visited appellant in his yard to apologize for swearing at him. Appellant invited James into his home, but James refused. Appellant asked James to come visit him again. James returned and then started visiting appellant regularly. After initially refusing, James finally accepted appellant's invitation to go into the house.

Inside the house James found appellant smoking marijuana. Appellant showed James the house describing one of the rooms as the "whore room." In this room James observed mirrors on the wall and over the bed and "lubricants" up on the bedboard. In the dining room area, James observed various salacious magazines such as Penthouse, Hustler, Oui and Playboy. James looked at some of these magazines.

In August of 1981, James began visiting appellant's home almost every evening. James viewed his relationship with appellant as one of trust and growing friendship.

Appellant first made sexual overtures toward James in September of 1981 when he attempted to touch James' penis. Appellant attempted to take off James' clothing, but James recoiled and left the house.

---

\*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

The following day, James returned to appellant's residence whereupon appellant tried to unzip James' pants. James resisted but permitted appellant to touch his penis through his pants. Sometime thereafter, James smoked marijuana with appellant. Appellant then proceeded to orally copulate James.

In September or October, appellant and a female guest invited James to watch appellant and the woman having intercourse in the "whore room." James then had intercourse with the woman.

James kept returning to appellant's residence where he was orally copulated by appellant on a number of different occasions. Appellant asked James to engage in sodomy. After initially refusing, James agreed and sodomized appellant. On about five separate occasions James orally copulated appellant. James eventually agreed to let appellant sodomize him. It hurt, and James did not return to appellant's house after that incident.

Sometime thereafter, James was contacted at his school by Sergeant Fredenburg, a Kern County deputy sheriff specializing in child abuse and sex crimes. Fredenburg was led to James by an anonymous tip. When questioned about appellant, James first denied even knowing him. Later in the conversation James admitted knowing appellant but denied any sexual contact. After further questioning, James admitted some sexual contact with appellant. Due to shame and embarrassment, however, James did not tell Sergeant Fredenburg everything. A more complete description of these events was provided at the preliminary hearing and pursuant to stipulation all of James' preliminary hearing testimony was read to the jury.

Shortly after talking with James, Sergeant Fredenburg executed a search warrant on appellant's residence. Appellant's house was extremely dirty and cluttered. One of the bedrooms had a sign which said "whore room." Another room was labeled "lesbian den" and had a wall covered with a variety of sexually explicit photographs. The search uncovered pornographic material and sexual devices including an artificial penis; no pedophile material was found. Appellant admitted knowing James but denied any sexual involvement; he described James as weird, and something of a nuisance. Appellant admitted that he was bisexual. Additional investigation led the police officers to two other young boys from the victim's neighborhood who had been approached by appellant and invited into his home "to look at pictures or be his friend."

Defendant did not testify; through his attorney he denied any sexual acts with James, argued that the boy was unreliable because of brain damage, and presented an expert witness in support of this contention. The testimony

of the prosecution psychologist, Dr. Cotton, will be considered below when we analyze its legal significance.

DISCUSSION

In determining whether the trial court erred in permitting Dr. Cotton's testimony over defendant's objections we shall (1) analyze *Bledsoe*; (2) determine whether the *Bledsoe* rule applies here; (3) consider whether this case falls within the *Bledsoe* exception permitting rehabilitation of a victim's credibility; and (4) consider Evidence Code section 352 as an independent ground of decision.

*1. Analysis of Bledsoe.*

We first examine the *Bledsoe* reasoning, so that we may test the doctor's testimony against the rule stated by the court. The prosecution called as an expert the rape counselor, who had assisted the 14-year-old victim, to testify that she suffered from rape trauma crisis syndrome. Such testimony was held inadmissible to prove that a rape had occurred, although the court noted that expert testimony on aftereffects of rape "may be admitted for a variety of purposes." (*People* v. *Bledsoe, supra,* 36 Cal.3d at p. 238.)

The function of rape counselors "is to help their clients deal with the trauma they are experiencing" and "the historical accuracy of the client's descriptions of the details of the traumatizing events is not vital in their tasks"; the counselors "are taught to make a conscious effort to avoid judging the credibility of their clients." (*Id.,* at p. 250.)

The diagnosis, while scientifically acceptable for treatment purposes, is not the product of a rigorous process the goal of which is determining truth or falsity (unlike fingerprint, lie detector, or blood tests). To admit the diagnosis to prove what events occurred leading up to the therapeutic treatment would be to misuse it for a purpose never intended by those in the discipline who developed the concepts. "Because the literature does not even purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred, we conclude that it may not properly be used for that purpose in a criminal trial." (*Id.,* at p. 251.)[1]

Permitting a qualified expert " 'to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was

---

[1]For our purposes we need not examine the rationale of this conclusion, which rests upon the test first enunciated in *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [34 A.L.R. 145], with respect to the admission of new scientific methods of proof.

therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness.' " (*Ibid.*) This is true even though no opinion is given on the ultimate question of guilt or innocence. Merely stating the diagnosis in psychological terms "is likely to mislead the jury into inferring that such a classification reflects a scientific judgment that the witness was, in fact, raped." (*Id.,* at p. 251, fn. 14.)

Recognizing that rape defendants often attack the victim's credibility by inferring falsity from delay in reporting the incident, the court notes that "evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault." (*Id.,* at p. 247.) Such expert testimony "may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.,* at pp. 247-248.)

### 2. Does Bledsoe apply here?

Much of the *Bledsoe* reasoning applies here. Instead of testimony that complainant suffers from rape trauma crisis syndrome, we have testimony that he is a victim of child molestation. Dr. Cotton, like the counselor in *Bledsoe,* had a professional duty to help the victim; he spent some 15 or more sessions with him, just as the *Bledsoe* counselor met with the 14-year-old victim in that case. Under examination by the prosecutor, Dr. Cotton agreed that certain tests corroborated his "clinical findings that he [i.e., James] was diagnosed as a victim of child molest."[2]

Respondent argues that *Bledsoe* is inapplicable because: (1) "The subject of rape trauma syndrome was not an issue in this matter" (true, but the reasoning seems to apply to diagnosis as a victim of child molestation); (2) "The subject of child molest syndrome was not the basis of Dr. Cotton's testimony" (perhaps not in those precise words, but the whole import of his testimony was that James was a molestation victim); (3) "Dr. Cotton's testimony was utilized for the purpose of showing why the victim's testimony should be credited. Although he did discuss some problems common to child molest victims, the essence of Dr. Cotton's testimony was that this particular victim could be believed because he was particularly vulnerable due to

---

[2]In opening statement the prosecutor told the jury that Dr. Cotton "will put some of these things together" and "add meaning to these various incidents." As shown in over 40 pages of the reporter's transcript, in response to the prosecutor's questions the doctor discussed in detail the facts as testified to by the victim, analyzing and explaining to the jury why, based on the evidence, he felt that "the clinical picture I saw of him" was that of a "victim of ongoing molest."

his background. . . ." This last contention raises the critical question upon which this case turns.

3. *Is Dr. Cotton's testimony authorized by the Bledsoe rule re psychological testimony on credibility?*

*Bledsoe,* as we have seen, allows expert testimony for certain purposes other than to establish defendant's guilt, such as to support the victim's credibility. But should we read *Bledsoe* to mean that in the support of credibility a psychologist may testify in detail about the specific facts in the case at hand, informing the jury of his diagnosis that the complainant was the victim of a sexual assault? To answer this, we look first to the exact language of the decision. The *Bledsoe* court would permit the expert to tell the jury about "recent findings of professional research on the subject of a victim's reaction to sexual assault" to rehabilitate the complaining witness. (*People* v. *Bledsoe, supra,* 36 Cal.3d at p. 247.) The language suggests— although it does not explicitly require—that the opinion testimony must be based upon the literature in the field and the general professional experience of the witness rather than upon an analysis and diagnosis based upon a review and evaluation of the facts in the case at hand. Thus, for example, a victim whose credibility is attacked for initially denying that he had been molested could be rehabilitated by expert testimony that such denials are more likely than not in molestation cases. The testimony would not be that this particular child was a victim of molestation, causing him to react in a certain way, but rather that as a class victims of molestation typically make poor witnesses, and are reluctant to disclose or discuss the sordid episodes.

Since the language used by the court does not clearly proscribe testimony in support of credibility based upon a diagnosis of the victim, we must consider *Bledsoe* further.

Credibility questions arise whenever the defendant denies the victim's story, explicitly or implicitly suggesting misrecollection or fabrication. If, in every such case, the jury could be informed that a doctor had diagnosed the complainant, based upon the specific facts in the case, as a child molest victim (or rape victim, or whatever), then the protection against misuse of psychologists' testimony erected by *Bledsoe* would be largely dismantled.

Where the expert refers to specific events, people, and personalities and bases his opinion as to credibility on his diagnosis of *this* witness, then the conclusion that the witness is credible rests upon the premise that the diagnosis is accurate, and that in fact molestation had occurred. The jury in effect is being asked to believe the diagnosis, to agree that the doctor's

analysis is correct and that the defendant is guilty.[3] Such a result would subvert the sound rule adopted by a unanimous Supreme Court in *Bledsoe*. It follows, therefore, that the expert testimony authorized by *Bledsoe* to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand.[4]

*4. Evidence Code section 352 as an independent ground of decision.*

While we believe that this reading of *Bledsoe* is proper, we find as an independent ground of decision that all of the above considerations required the trial court to exclude this testimony under Evidence Code section 352, even though this was not specifically urged in support of defendant's various objections.[5] It would be possible for an expert witness to tell the jury about various studies showing typical responses of victims in molest situations without relying on a detailed analysis of the facts in the case at hand. All of the "probative value" that the prosecution was entitled to could have been preserved by so limiting the doctor's testimony, without creating any "substantial danger of undue prejudice." (Evid. Code, § 352.) The doctor's discussion of the specific facts of this case in support of his conclusion that the complainant was indeed a victim of molestation by the defendant had all the force of a district attorney's closing argument, and even greater impact since it was delivered in clinical terms by a "doctor" purporting to make an objective scientific analysis.

## CONCLUSION

We conclude that the court erred in admitting the psychologist's testimony diagnosing the complainant as a molestation victim. Expert testimony was admissible as bona fide rebuttal, such as statements that there was no evidence of brain damage and that the witness was competent to testify, and testimony based on general literature or experience as to the

---

[3]If the testimony as to James' credibility were based exclusively on the molestation diagnosis, relying just on the facts of this case, it would be irrelevant unless the jury first agreed that molestation had taken place as James testified. And if the jury agreed on *that* there could be no purpose for the evidence in support of his credibility—it would have already been decided.

[4]Less strict rules of admissibility apply where child abuse is an issue in noncriminal cases, such as Welfare and Institutions Code section 300 dependency proceedings. But even here it has been held that testimony of a psychiatrist that a child was sexually abused *by her father* was inadmissible, although an opinion could be given that the child had suffered abuse. (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1116 [200 Cal.Rptr. 789].)

[5]We do not hold that the court has an obligation to reject such testimony on its own motion where the defense makes no objection at all. However, the failure of defendant's counsel to refer specifically to section 352 as a basis for objection should not be controlling.

reluctance of molest victims, as a class, to talk to investigators. That leaves the question of whether the error was prejudicial. James' testimony was forthright and convincing; it held up under cross-examination, and was supported by corroborating facts concerning the nature of the defendant's establishment. Although his credibility was attacked by the defense psychologist, it was virtually unscathed, and was supported by a number of witnesses who know the young man well at his school and church. We conclude that it is not reasonably probable that the erroneous admission of Dr. Cotton's testimony affected the judgment. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Hanson (P. D.), Acting P. J., and Martin, J., concurred.