Filed 8/23/24  P. v. Fuentes CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ADEMAR OSBELI FUENTES,<br><br>Defendant and Appellant. | B320065<br><br>(Los Angeles County<br>Super. Ct. No. BA478241-01) |

APPEAL from a judgment of the Superior Court of Los Angeles County,  Deborah S. Brazil, Judge.  Affirmed with directions.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

On October 27, 2021, a jury found appellant Ademar Osbeli Fuentes guilty of four counts of lewd and lascivious acts upon a child under age 14 in violation of Penal Code[1] section 288, subd. (a). Appellant was sentenced to a term of imprisonment of 12 years, composed of the midterm of six years on count 1 and one-third the midterm of two years to be served consecutively on the three remaining counts. We affirm the judgment.

## FACTS

In 2015, A.O. (born in 2003) lived with appellant, her mother and her half-sister I.F. A.O. had known appellant since she was three and a half years old. She testified that there was "a lot of love and trust in that relationship" and that she loved and trusted appellant. Her relationship with appellant was "more tight" than her relationship with her mother. Besides I.F., appellant has three other children.

Appellant, A.O.'s mother, A.O., and I.F. lived in a two-story house. On the first floor were the living room, kitchen and laundry room. Upstairs were three bedrooms. There was a bedroom for A.O.'s mother and appellant, a guest room, and a bedroom A.O. shared with I.F.

A.O. was scared to sleep alone and asked to sleep with appellant, which she did about six times. They slept in the guest room.

A.     **Count 1**

A.O., 12 years old at the time, was awake and lying on her back. Her eyes were closed and the lights were off. Appellant

---

[1]     Undesignated statutory references are to the Penal Code.

2

thought she was asleep. Appellant gripped her breasts with both hands. Next, he slipped his hand under A.O.'s underwear and touched the outside of her vagina. He was moving his fingers around. A.O. knew this was a sexual act. She testified that she was "surprised because it was something he's never done before, something that I never experienced. So I was—I was in shock." A.O. moved her body. Appellant realized she was awake and stopped touching her. A.O. stayed in bed and never told anyone what happened. She was confused because appellant had never done such things before.

B. **Counts 2, 3 and 4**

A.O. was still 12 years old. She went back to the bed in the guest room with appellant because she loved him "and I trusted him and I didn't fear him and I just needed the company." She was asleep. When she woke up, her clothes were off. Appellant put his fingers inside her vagina. His fingers were moving inside her vagina. Appellant said he loved her and A.O. said " 'I know.' " Next, he put his mouth on her vagina. "His tongue was moving on my vagina." Appellant was on his knees as he put his erect penis in her mouth. He ejaculated. A.O. testified that she was confused and didn't know what was going on. After this incident, she did not want to be alone with appellant anymore. While she originally thought her family was perfect, "after the abuse it is really hard to keep living with him with those expectations because it wasn't true."

A.O. did not tell anyone about the abuse because no one would believe her. It was difficult for her to talk about the abuse because "he was the only person that I truly loved and I know cared about me. And I just didn't want to lose that."

The jury found true the allegation that appellant sexually penetrated A.O.'s vagina (count 2) and that he engaged in an act of oral copulation (counts 3 and 4), in violation of section 1203.066.

C.    **The Las Vegas Incident**

A.O. recalled that when she was 13 years old, she and I.F. went to Las Vegas with appellant.  The three of them stayed at a hotel in a room that had two beds separated by a nightstand. A.O. slept in the bed next to the bathroom and I.F. slept in the other bed next to the window with appellant.  A.O. woke up to appellant touching her breasts.  Appellant touched her thigh and inserted his fingers in her vagina, and she grabbed his hand and told him to stop.  Appellant tried to get on top of her, but A.O. pushed him off and told him to stop.  When she tried to get off the bed, appellant pulled her back on the bed, and A.O. "just laid there like always."  I.F. remained asleep.  When appellant finished touching her, he went to the bathroom, and A.O. stayed in bed and started to cry.  Appellant came out of the bathroom, got on his knees and started to pray.  He cried and said that he was sorry, and A.O. told him it was "okay" but really was not. A.O. said her head hurt and appellant gave her a Tylenol.  He asked what she wanted for her birthday.  She said she no longer wanted to go to the concert for her birthday, but appellant said he was still going to take her.

After the trip to Las Vegas, A.O. stopped visiting appellant. A.O.'s mother asked A.O. if appellant had done anything to her. A.O. felt embarrassed and blamed herself ("I felt like it was my fault") and told her mother nothing had happened.

After the incidents occurred, A.O. learned from her aunt that appellant was not her biological father. A.O. was confused and surprised by this revelation.

D. **Disclosure**

On January 12, 2019, when A.O. was 15 years old and a sophomore in high school, she went to an overnight school retreat focused on social and emotional well-being. Her school counselor, Ms. Lopez, was present with another counselor and the girls in her cabin formed a sharing "circle" and started to share different things from their lives. A.O. disclosed that appellant had done sexually inappropriate things to her. "I was a sophomore in high school and we went to a camp that my school uses. And it was the second night at the camp and we were in the cabin with the girls that was assigned to that cabin. [¶] And we put on our pajamas and were just talking and I just felt the need to say it. And I just said what had happened. [¶] And my counselor was there and another counselor was there and the Monday of that week [my counselor] called me into her office and she told me that I had to come forward about it."

A.O. testified her mother knew "something was happening" and A.O. "needed to tell someone because I couldn't deal with what I was going through alone." "I felt really, really relieved, and it felt really good."

After the circle concluded, Lopez took A.O. aside and explained she was a mandated reporter with a duty to report the incident. A.O. was afraid her mother and I.F. might not believe her and she was also afraid that something might happen to I.F.

On Monday, January 14, 2019, Lopez reported the incident to the Los Angeles County Department of Children and Family Services. When Lopez called A.O.'s mother to come to her office,

A.O. asked Lopez to explain the incident to her mother and remain with her while she spoke to her mother. After Lopez told A.O.'s mother that A.O. had disclosed an incident she had to report, A.O.'s mother started to cry and asked A.O. if she was sure that it happened and A.O. said "Yes." Afterward, A.O.'s mother took A.O. to the police station to make a report.

E. **Child Sexual Abuse Accommodation Syndrome (CSAAS)**

Dr. Jayme Jones is a Clinical Psychologist and expert on the sexual abuse of children. Dr. Jones explained that CSAAS is a model that was developed by Dr. Roland Summit to help people understand the reactions of children who have been sexually abused. It is not a diagnostic model and does not tell whether or not someone was abused. Dr. Jones is not familiar with the facts of this case and does not know the victim. This is intentional because Dr. Jones wanted to focus on the reaction of children in general rather than this specific case.

According to Dr. Jones, there is an assumption that children who are attacked will fight back or run away when, actually, they tend to freeze. There is also an assumption that children will immediately disclose that they have been abused when most never tell anyone, and those that do often disclose the abuse years or decades later.

Dr. Jones explained there are five parts to CSAAS: secrecy, helplessness, accommodation, delayed disclosure, and recantation. Secrecy stands for the fact that child sexual abuse happens in private and there are no witnesses. Helplessness has two aspects to it. One is the physical disparity between children and adults, i.e., children don't fight because they can't win. The

second aspect is that children are raised to do what adults tell them to do.

Children learn to accommodate or cope with ongoing abuse. One of the most common ways to accommodate abuse is to pretend it has not happened. Delayed disclosure means most children never tell anyone about the abuse and, when they do tell someone, it is often years later. A small number of children will disclose during the first year but it is much more common that they disclose the abuse years later, if at all. Disclosure comes out bit by bit, depending on the reaction of the person to whom the child discloses the abuse.

Recantation is the taking back of a disclosure, and although it is not present in every case, it is much more common in cases where there is a negative reaction following a disclosure.

Dr. Jones explained it is a myth that a child sexual abuse victim will disclose immediately after the abuse. Studies have shown that 10 to 15 percent of victims disclose within the first year and 20 to 25 percent disclose up to five years after the abuse. It is also a myth that a child will not go near the abuser again because the child has both positive and negative feelings about the abuser.

F.    **The Polygraph Test**

On May 13, 2019, Los Angeles Police Department polygraph examiner Jesse Delgado conducted a video recorded interview of appellant. The interview was voluntary and appellant was told he was free to leave. Appellant denied sexually abusing A.O. After Delgado told appellant he failed the polygraph test, appellant said he was sorry for what he did, and he had been crying for two years. Appellant admitted he put his penis in A.O's mouth once. He denied ejaculating. Appellant also

admitted he put his finger on A.O.'s vagina once, and he licked her vagina once. However, appellant claimed A.O. "was the one that started."

At trial, the court gave the jury a limiting instruction on the polygraph test.[2]

G.    **The Defense Case**

Appellant testified in his defense and denied sexually abusing A.O. Appellant characterized his admissions during the polygraph test as lies.

Appellant grew up in Guatemala and has a degree in education. He came to the United States in 1992 when he was 19 years old. He married during the next five years and had two children. He worked sequentially sewing clothes on a sewing machine, as a driver, and as a maintenance technician. He has held the last position for 26 years.

Family members testified appellant is not a child molester.

The defense presented evidence by a forensic psychologist about false confessions.

---

[2]    "You may hear evidence of a statement made by the polygraph examiner to the defendant regarding possible polygraph test results. [¶] This statement is not being admitted for the truth of the matter asserted in that statement. Rather, this statement is being admitted for the sole purpose of showing the affect or impact on the listener. [¶] The actual polygraph test results are not admitted as evidence. You may consider the statement made by the polygraph examiner solely to judge the credibility and/or reaction, behavior and statements made thereafter by the defendant. [¶] Evidence of the polygraph examiner's statements concerning the results of the polygraph [test] may not be used by you for any other purpose."

## DISCUSSION

### A.  CSAAS Evidence Is an Established and Useful Doctrine of California Law

Appellant contends it was error to admit evidence about the CSAAS doctrine.  According to appellant, CSAAS evidence is irrelevant and prejudicial, rendering appellant's trial fundamentally unfair.

CSAAS is an established doctrine in California.  Contrary to appellant's contention, CSAAS, properly applied, serves to inform the jury of the characteristics of sexually abused children and their parents, a topic with which juries cannot be expected to be familiar.  "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1302 (*McAlpin*).)  An important limitation of CSAAS evidence is that it cannot be used to prove that the actual sexual abuse has in fact occurred.  CSAAS evidence is used to explain the conduct of sexually abused children as a class and of their parents, if parental behavior is at issue.  CSAAS describes the syndrome[3] of a sexually abused child.

*People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), addresses how the legal system treats a syndrome recognized by the medical profession.  In *Bledsoe,* the defendant was charged with the forcible rape of a 14-year-old-girl.  A rape counselor testified

---

[3]  A syndrome is defined as a group of signs and symptoms that occur together and characterize a particular abnormality. ('Merriam-Webster Dictionary Online (2024) https://www.merriam-webster.com/dictionary/syndrome [as of August 22, 2024], archived at <https://perma.cc/3P59-48SL>.)

about "rape trauma syndrome" and then gave her opinion that the girl was suffering from it. (*Id*. at pp. 242–243.) "[I]n such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id*. at pp. 247–248.) In *Bledsoe*, however, the evidence was introduced as a means of proving that the rape had in fact occurred. (*Id*. at p. 248.) The court concluded that testimony that a complaining witness suffers from rape trauma syndrome is not admissible to prove that the victim was raped. "We emphasize that our conclusion in this regard is not intended to suggest that rape trauma syndrome is not generally recognized or used in the general scientific community from which it arose, but only that it is not relied on in that community for the purpose for which the prosecution sought to use it in this case, namely, to prove that a rape in fact occurred. Because the literature does not even purport to claim that the syndrome is a scientifically reliable means of proving that a rape occurred, we conclude that it may not properly be used for that purpose in a criminal trial." (*Id*. at p. 251.) Thus, while evidence about rape trauma syndrome was admissible to the extent that it was informative about the characteristics of persons afflicted with this syndrome, evidence of the syndrome could not be used to prove that the rape had actually occurred.

  *People v. Roscoe* (1985) 168 Cal.App.3d 1093 (*Roscoe*) drew on *Bledsoe,* to decide a case involving the sexual molestation of a minor. In *Roscoe,* defendant was convicted of oral copulation and sodomy of a 15-year-old boy. (*Id*. at p. 1095.) A clinical psychologist spent 15 sessions or more with the boy and testified

that "certain tests" corroborated his clinical findings that the boy had been diagnosed as a victim of a child molestation. (*Id.* at p. 1098.)

The court found that *Bledsoe* allowed expert testimony on such topics as the victim's credibility. "Thus, for example, a victim whose credibility is attacked for initially denying that he had been molested could be rehabilitated by expert testimony that such denials are more likely than not in molestation cases." (*Roscoe, supra,* 168 Cal.App.3d at p. 1099.) However, the opinion had to be based on based upon the literature in the field and the general professional experience of the witness rather than upon the facts of the case at hand. "The testimony would not be that this particular child was a victim of molestation, causing him to react in a certain way, but rather that as a class victims of molestation typically make poor witnesses, and are reluctant to disclose or discuss the sordid episodes." (*Ibid.*) The court concluded the psychologist's testimony that the boy had been molested was inadmissible under *Bledsoe.* (*Id.* at p. 1100.)

*People v. Bowker* (1988) 203 Cal.App.3d 385 addresses testimony about CSAAS. In this case, a 10-year-old girl and her nine-year-old brother exhibited signs of sexual abuse. (*Id.* at p. 388.) An expert testified at length about CSAAS, describing its five stages. (*Id.* at p. 389.) However, the expert went beyond the parameters established by *Bledsoe.* His testimony was replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed. The expert "in effect said regardless how inconsistent a child's accounts of abuse are, abused children give inconsistent accounts and are credible nonetheless." (*Id.* at p. 394.) The court concluded this amounted to testimony that the molestation had

in fact occurred.  (*Id.* at p. 395.)  *Bowker* explained the ground rules for CSAAS evidence: "[T]he jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true.  The jurors must understand that CSAAS research approaches the issue from a perspective opposite to that of the jury.  CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience.  [Citation]  The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested."  (*Id.* at p. 394.)  The court concluded that the expert's testimony about CSAAS had not been properly limited.  (*Id.* at p. 395.)

Given these guidelines, admission of CSAAS evidence has been approved where it is used to explain the reaction of children and parents to abuse.  (*People v. Gray* (1986) 187 Cal.App.3d 213, 218 [CSAAS evidence used to explain delay in reporting abuse]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 (*Sanchez*) [CSAAS evidence can be used to dispel misconceptions]; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 [CSAAS evidence used to explain delayed disclosure]; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383 [CSAAS evidence used to rehabilitate credibility], superseded on other grounds as recognized in *People v. Levesque* (1995) 35 Cal.App.4th 530, 536-537; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1745 [CSAAS evidence used to buttress victim's credibility]; *In re S.C.* (2006) 138 Cal.App.4th 396, 418 [CSAAS evidence on the issue of recantation]; *People v. Perez* (2010) 182 Cal.App.4th 231, 245 [CSAAS evidence used to explain inconsistency in victim's testimony]; and *People v. Munch* (2020)

52 Cal.App.5th 464, 467 (*Munch*) [CSAAS evidence used to explain delay in reporting].)

CSAAS evidence, properly applied, sets forth various standards applicable to child sexual abuse. As an example, delay by the victim in reporting the abuse is common. The finder of fact is then asked to determine whether the child conformed to the standard, i.e., whether the child delayed in reporting the abuse. If the answer is yes, the jury may find that the child's conduct is not inconsistent with that of an abused child. The jury may then proceed to find, although it does not have to do so, that the child is credible notwithstanding their conduct. It is evident that in setting general standards, CSAAS functions in a manner with which the legal system is very familiar.

CSAAS, delivered with an instruction to the jury that CSAAS does not prove that the molestation or abuse has actually occurred, is a useful tool that informs the jury of the characteristics of children, as a class, who have been sexually abused.

B. **Appellant's Objections to CSAAS Evidence are Without Merit.**

Appellant advances various objections to CSAAS evidence. None of them are meritorious.

A preface is in order. CSAAS evidence is not limited to rehabilitating the credibility of a complaining witness. While this is a function of CSAAS, it is not its only function. CSAAS also informs the jury of aspects unique to child sexual abuse, such as accommodation and delayed reporting. In addition, CSAAS provides a global summary of the unique features of child sexual abuse cases. Given that the jury is generally not familiar

with child sexual abuse, a global perspective is certainly pertinent.

Appellant contends that an expert "testified regarding statistical data regarding delayed disclosure of child sexual abuse." It is true Dr. Jones testified that studies have shown that 10 to 15 percent of victims disclose within the first year and 20 to 25 percent disclose up to five years after the abuse. In this case, the delay was three years. It is evidently an aspect of child sexual abuse that frequently there is a delay in reporting the abuse. A properly qualified expert like Dr. Jones can certainly testify to this aspect of child sexual abuse. The testimony was general and did not provide an opinion about the delay in this case.

Appellant claims that Dr. Jones "unfairly vouched for the victim's credibility." Nothing of the sort occurred. Dr. Jones is not familiar with the facts of this case and does not know the victim. This is intentional because Dr. Jones wanted to focus on the reaction of children in general rather than the victim's reaction in this specific case.

Appellant claims that Dr. Jones invited the jurors to presume "appellant was guilty based on statistical probabilities." That simply is not true. Dr. Jones' testimony was limited to generalities about child sexual abuse and made no reference whatever to the facts of this case.

Without citation to authority, appellant claims CSAAS evidence is "equally consistent with false accusations as they are with true accusations." The premise of this contention is incorrect. There is no "false accusation" under CSAAS. In fact, there is no "accusation" whatever under CSAAS because the working assumption is that abuse has occurred.

14

Appellant claims CSAAS evidence "does not meet the legal requirements for the admissibility of scientific evidence." The contrary is true. It has been held that CSAAS evidence meets the *Kelly-Frye*[4] standard. (*Sanchez, supra,* 208 Cal.App.3d at pp. 734–735.)

Appellant contends "[a] review of the testimony in this case shows that the prosecution expert never interviewed the victim and never reviewed reports relating to this case, but was simply testifying to show that the victim's behavior was consistent with an abuse victim." Dr. Jones never testified that A.O.'s behavior was consistent with that of an abuse victim. She pointedly did not refer to the facts of this case, with which she was not familiar.

Next, appellant states CSAAS expert testimony serves no legitimate purpose. That is not true. One of the purposes of CSAAS evidence is to summarize pertinent aspects of child sexual abuse, such as secrecy and helplessness. Another is to inform the jury that sexually-abused children tend to delay reporting the abuse. This was information the jury needed to know in deciding whether A.O. was telling the truth, but the information did not tell the jury how to decide that issue.

Appellant cites *People v. Wilson* (2019) 33 Cal.App.5th 559 and *People v. Julian* (2019) 34 Cal.App.5th 878 for the proposition that statistical evidence is inappropriate because it supplants the jury's decision about the credibility of the victim. In *Wilson,* the expert testified that there was at least a 94 percent chance that the victim was telling the truth. (*Wilson,* at p. 570.) In *Julian,* the same expert testified there was a 92 to 99

---

[4]     *People v. Kelly* (1976) 17 Cal.3d 24, 30 and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014.

15

percent probability that there had been abuse.  (*Julian,* at p. 886.)  There was no such testimony in this case.  Dr. Jones made it clear that she was not familiar with the facts of this case, did not know A.O., and had not met her.  Dr. Jones offered no opinion on the statistical probabilities that abuse had taken place.  In fact, she offered no opinion whatsoever on this case.

Appellant argues CSAAS evidence does not serve any useful function because there are no longer misconceptions to correct about child sexual abuse.  But CSAAS is not limited to dispelling misconceptions.  CSAAS also serves to identify the unique features of child sexual abuse such as delayed reporting and accommodation.  CSAAS also summarizes from a global perspective the identifying characteristics of child sexual abuse, i.e., secrecy, helplessness, accommodation, delayed reporting, and recantation.  A global overview of child sexual abuse is without a doubt useful information for a jury deciding such cases.

Appellant states CSAAS evidence is not science.  But there is no claim that CSAAS evidence is "science."  CSAAS summarizes various aspects of child sexual abuse and presents them in a coherent fashion.  It also furnishes information the jury needs to make its decision, but it does not tell the jury what that decision should be.

"The problem with CSAAS evidence is the likelihood the jury will misuse it as a diagnostic tool to determine if the complaining witness has been molested."  Not so. CALCRIM No. 1193, as given here, specifically states that "Dr. Jones' testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged."

Appellant states "CSAAS evidence is generic testimony unrelated to the case at hand or the alleged victim."  That is quite

16

true. CSAAS summarizes five aspects of child sexual abuse and it furnishes the jury with information about child sexual abuse.

Appellant also states "CSAAS evidence is unreliable as a matter of law to prove that a molest[ation] has occurred." CSAAS evidence assumes that abuse has occurred. It is not used to prove that abuse has occurred.

Appellant contends that CSAAS evidence violated due process because "[c]ontrary to the normal use of evidence, the CSAAS testimony served to tell the jury the opposite—that evidence of the witness lacking credibility was instead proof the witness was credible." But no opinion was offered by Dr. Jones on A.O.'s credibility. As discussed in the next section, CSAAS evidence only informed the jury that it could, but did not have to, discount A.O.'s inconsistent conduct while deciding whether she was credible.

## C.    **CALCRIM No. 1193 Is Not Inconsistent.**

The court instructed the jury with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Jayme Jones regarding [CSAAS]. [¶] Evidence presented by Dr. Jones' testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged. [¶] You may consider this evidence only in deciding whether [A.O.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Appellant contends that "evaluating the believability of her testimony" impermissibly broadens the use of CSAAS evidence and invites the jury to find that A.O. is credible and that appellant molested her. Appellant states this lessens the prosecution's burden of proof and also violates the due process clause.

17

We review instructional error claims under a de novo standard of review. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175 (*Lapenias*).)

Appellant interprets "believability of her testimony" as referring to the decision whether or not A.O. had been abused. The argument is that if the jury finds the child to be credible, it will conclude that the abuse took place. But this conflicts with the preceding sentence in CALCRIM No. 1193 that CSAAS is not evidence that the defendant committed the crimes charged.

The phrase "evaluating the believability of her testimony" in CALCRIM No. 1193 refers to a process about the child's credibility that is ongoing and continuous and may very well lead to the conclusion that the child cannot be believed.

An explanation is in order. There was much in A.O.'s conduct that was at best equivocal. After the first encounter, she returned to sleep again with appellant. And she delayed in reporting the abuse. CSAAS explains this conduct with the observation that abused children will accommodate the abuser and delay reporting the abuse. A.O.'s conduct was therefore not inconsistent with the conduct of someone who has been molested. Her believability was therefore not necessarily affected by the inconsistency of her conduct. The jury could disregard her conduct in deciding whether she could be believed, i.e., CSAAS neutralized A.O.'s self-impeaching behavior. The jury could still conclude that A.O. could not be believed but it would reach that conclusion on factors other than that she went back to sleep with appellant after the first encounter and delayed reporting the abuse.

*People v. Gonzales* (2017) 16 Cal.App.5th 494 put the foregoing point this way: "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS expert] Ward's testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.* Thus, under CALCRIM No. 1193, a juror who believes Ward's testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability *one way or the other*, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Id.* at p. 504, italics added.)

The foregoing is not an isolated decision. *Munch*, *supra*, 52 Cal.App.5th at p. 474, *Lapenias, supra,* 67 Cal.App.5th at pp. 175–176, *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816, and *People v. Ramirez* (2023) 98 Cal.App.5th 175, 219–220 all follow the interpretation of CALCRIM No. 1193 that appears in *Gonzales*. These cases are supported by *McAlpin,* which held that an expert testifying that it is not unusual for a parent to refrain from reporting a known molestation of his or her child was testimony which the jury needed in order to objectively evaluate the parent's credibility. (*McAlpin, supra,* 53 Cal.3d at pp. 1300–1302.) *McAlpin* approved the use of CSAAS-type testimony to empower the jury to disregard conduct inconsistent with the status of the testifying witness.

These cases have not only followed the interpretation of CALCRIM No. 1193 in *People v. Gonzales,* they have also rejected claims, like those advanced in this case, that this instruction

violates due process and lessens the prosecution's burden of proof, when, in fact, this instruction only informs the jury that it may, but does not have to, disregard inconsistent conduct by the allegedly abused child in deciding whether the child can be believed.

CSAAS in this context is informative. It does no more than inform the jury of unusual features of child abuse cases. The jury, composed of people living everyday lives, cannot be expected to be aware of the fact that children will try to accommodate the abuser and may also delay reporting the abuse.[5] Being told that one can, but need not, ignore inconsistent conduct does not even remotely implicate the due process clause. The same can be said of appellant's argument that this instruction lessens the prosecution's burden of proof.

D. **It Was Not Error to Instruct the Jury with CALCRIM No. 1191B.**

Appellant contends it was error to instruct the jury with CALCRIM No. 1191B because it allowed the jury to "consider charged offenses as propensity evidence on other charged offenses."

In *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*) our Supreme Court approved an instruction basically identical to CALCRIM No. 1191B. (*Villatoro,* at p. 1167.) The instruction approved in *Villatoro* is CALCRIM No. 1191, which is largely based on Evidence Code section 1108: "In a criminal action in

---

[5]     It bears repeating. "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child." (*McAlpin, supra,* 53 Cal.3d at p. 1302.)

20

which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code s]ection 352." (Evid. Code, § 1108, subd. (a).)

Appellant correctly acknowledges we are bound to follow *Villatoro* under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*). Not only are we bound by *Villatoro*, but we must also follow the law the Legislature has enacted. The extended analysis of the issue by *Villatoro* aside (*Villatoro, supra*, 54 Cal.4th at pp. 1159–1167), Evidence Code section 1108, subdivision (a) requires us to approve of the use of propensity evidence when it comes to sexual offenses. "[I]n a sex offense case, as here, the Legislature has made the careful determination that evidence the defendant committed one or more sex offenses may be properly considered pursuant to [Evidence Code] section 1108." (*Villatoro*, at p. 1165.)

Given that the propensity to commit sexual offenses is not a common attribute among the general public, evidence that a particular defendant has such a propensity is especially probative. (*Villatoro, supra*, 54 Cal.4th at p. 1164.) The court retains the power to exclude such evidence under Evidence Code section 352 if it finds that it poses a substantial danger of undue prejudice.

E. **Evidence Code Section 1108 Does Not Violate Due Process.**

Appellant contends Evidence Code section 1108 violates due process.

As before, appellant acknowledges we must follow *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*), which upheld Evidence Code section 1108 against a due process challenge. (*Auto Equity Sales, supra,* 57 Cal.2d at p. 455.) *Falsetta* extensively analyzed the issue (*Falsetta,* at pp. 911–915) and concluded the "trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge." (*Falsetta,* at p. 917.) We note the Supreme Court has repeatedly refused to revisit *Falsetta.* (*People v. Lewis* (2009) 46 Cal.4th 1255, 1288–1289; *People v. Loy* (2011) 52 Cal.4th 46, 60–61; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827; *People v. Molano* (2019) 7 Cal.5th 620, 664; *People v. Baker* (2021) 10 Cal.5th 1044, 1090.)

As is true of *Villatoro*, there is much in *Falsetta* that is persuasive. Among other aspects of *Falsetta*, the practical observation of particular interest is that sex crimes are usually committed without third party witnesses and propensity evidence is therefore probative.[6]

---

[6]   "As the legislative history indicates, the Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta, supra*, 21 Cal.4th at p. 915.)

22

F.   **The Abstract of Judgment Must Be Amended to Include an Order for AIDS Testing.**

In its oral pronouncement of judgment, the court did not order AIDS testing. However, the minute order of the sentencing states appellant must submit to an AIDS test per Penal Code section 1202.1.

"[T]he court shall order every person who is convicted of . . . a sexual offense listed in subdivision (e), whether or not a sentence or fine is imposed or probation is granted, to submit to a blood or oral mucosal transudate saliva test for evidence of antibodies to the probable causative agent of acquired immunodeficiency syndrome (AIDS) within 180 days of the date of conviction."  (§ 1202.1, subd. (a).)

Appellant was convicted of oral copulation and of violations of section 288. Both offenses require AIDS testing under section 1202.1.  (§ 1202.1, subds. (e)(4) [oral copulation] and (e)(5)(A)(iii) [section 288 violation].)

"The trial court has no discretion in the matter; the order for the AIDS blood test is mandatory.  (§ 120[2].1, subd. (a); [Citation.].)  The trial court's sentence omitting the order for an AIDS test was unauthorized and subject to correction at any time."  (*People v. Barriga* (1997) 54 Cal.App.4th 67, 70.)

The case must be remanded for an AIDS test and for amendment to the Abstract of Judgment.

## DISPOSITION

The judgment is affirmed.  The case is remanded with directions to amend the Abstract of Judgment to include an order for AIDS testing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:



WILEY, J.



VIRAMONTES, J.