Filed 4/8/26  P. v. Nguyen CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>PATRIC KUSUMA NGUYEN,<br><br>      Defendant and Appellant. | A170809<br><br>(San Mateo County<br>Super. Ct. No. 21-NF-012807-A) |

A jury convicted Patric Kusuma Nguyen of one count of forcible rape. The evidence at trial included the transcript and video of a pretext call between Nguyen and the victim ("Doe").  During the call, Nguyen mentioned to Doe that an attorney advised him not to talk with her, but he continued speaking and answering her questions and did not deny her accusations of rape.  At trial, the prosecution repeatedly commented on Nguyen's failure to deny the rape accusations, and the trial court instructed the jury it could consider Nguyen's nondenials as an adoptive admission.

On appeal, Nguyen contends the trial court erred by (1) permitting the investigating police officer in the case to testify as an expert on sexual abuse and domestic violence relationship dynamics; (2) admitting evidence of a post-offense uncharged act to show Nguyen's propensity to commit the charged offense; (3) violating his Fifth Amendment privilege against self-incrimination by admitting the pretext call evidence, permitting the

1

prosecution to remark on Nguyen's silence, and instructing the jury on adoptive admissions; and (4) ordering Nguyen to pay restitution to Doe for losses unrelated to the charged crime.

We find no abuse of discretion in the trial court's admission of the expert testimony or the propensity evidence. As to the Fifth Amendment issues related to the pretext call, we elect to reach the merits notwithstanding Nguyen's failure to object below. We first conclude the rationale of *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), which prohibits drawing an adverse inference from an accused's failure to reply to an accusatory statement when asserting the constitutional privilege against self-incrimination, may apply to a pretext call notwithstanding the absence of ostensible government coercion. However, the circumstances here, viewed in their totality, did not lend themselves to the inference that Nguyen was relying on his counsel's advice to maintain the right of silence, as Nguyen voluntarily engaged in a lengthy conversation with Doe and spoke freely about his actions. As such, it was not error for the court to permit the prosecution to explore and remark upon Nguyen's failure to deny Doe's rape allegations and instruct the jury on adoptive admissions.

Finally, we agree in part that the trial court erred in ordering Nguyen to pay restitution for certain expenses not related to his criminal conduct. Accordingly, we will order modification of the judgment to reduce the restitution award and affirm the judgment as modified.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

On August 26, 2022, Nguyen was charged by information with one count of forcible rape of Doe on August 27, 2019. (Pen. Code, § 261,

---

[1] Additional background facts relevant to the contentions on appeal are set forth in the relevant sections of the Discussion, *post*.

subd. (a)(2).)[2]  A trial was held in 2024.  We now summarize the relevant testimony.

### A. Trial Testimony

#### 1. Jane Doe

Nguyen and Doe met in September 2017 as college students in Illinois. They began dating exclusively on October 5, 2017, and the relationship went through "ups and a lot of downs."  Doe testified that when Nguyen was angry, he would throw "things" (e.g., a remote control, pillows, and an eyeglass case) "at" her.

In April 2018, Doe discovered Nguyen was having online communications of a sexual nature with another woman.  This caused Doe to suffer a mental health breakdown, and she was hospitalized for several days.

In August 2018, Doe learned she had contracted chlamydia, a sexually transmitted infection (STI).  She believed Nguyen had given her chlamydia, in part because she had tested negative prior to dating Nguyen.  When Doe confronted Nguyen about contracting chlamydia, he "blamed it on [her]" and told her "it was [her] fault."

Nguyen attempted to break up with Doe multiple times, but she wanted the relationship to continue.  She stayed with him because he was her "lifeline" in college, and she loved him.  She also told Nguyen he should "take accountability for past actions," including being unfaithful and lying about it, giving Doe an STI, and accepting a July 2018 trip to the Philippines paid for entirely by Doe's mother.

Nguyen eventually dropped out of college and attended a flight attendant training program in Houston.  After completing the program in early 2019, Nguyen moved to South San Francisco to work.  Doe also dropped

---

[2]     Further unspecified statutory references are to the Penal Code.

out of school and returned to her hometown in Illinois. Despite the distance, Doe and Nguyen saw each other several times a month and continued having sexual relations.

Doe and Nguyen broke up in June 2019 but continued to exchange romantic communications. On August 26, 2019, Doe told Nguyen over a video call that she had had a sexual encounter with someone else. Nguyen "took it really badly" and "cut himself." Doe asked what she could do to make it better, and Nguyen said to "be with him," so Doe flew to South San Francisco the next morning.

The circumstances of the charged rape were as follows. Doe arrived at Nguyen's home on August 27, 2019, while he was at work, so she used a passcode to enter the residence. Doe went into Nguyen's room and took a nap. Nguyen eventually arrived and got into bed with her in his underwear and shirt. Nguyen expressed feeling heartbroken and told Doe he loved her. According to Doe, the conversation "wasn't going that great," and they "lay[] there in silence" for a while until Nguyen started pulling Doe to get her to lay on her side to look at him. Doe stared at the ceiling and would not look at Nguyen, but he moved her onto her side. Doe told Nguyen she did not want to look at him, but after further tugs, he managed to get her to look at him. Doe then closed her eyes and Nguyen began kissing her, but she did not kiss him back. Nguyen then got on top her and began "dry humping [her] leg while continuing to kiss [her]." As he lifted Doe's hips, she understood he wanted to engage in a sexual act. Doe told Nguyen, "You don't want this," and he replied, " 'I do; I do want this.' " Doe then stated, "I don't want this." After Nguyen removed Doe's pants, he "put his hand under [her] back and lifted [her]" in order to take off her shirt. Doe "kept crying stop." Doe testified she did not take her off her clothes voluntarily and was "frozen" and

4

unable to move. She was "scared" because Nguyen "was doing something I didn't want him to." She was crying when Nguyen put his penis into her vagina and asked him to stop "[b]ecause it hurt." Instead of stopping, Nguyen said, " 'less crying, more moaning.' " Doe told Nguyen to stop four or five times. Nguyen was not wearing a condom, and he ejaculated. Afterwards, Doe continued to cry and lay in bed "feeling frozen." Nguyen told Doe he felt "bad" because he "felt like he did something wrong."

Doe had never previously told Nguyen to stop when he initiated sex. Asked why she did so on August 27, 2019, Doe explained, "I felt like we had a pattern of having make-up sex a lot, and I wanted to break that pattern. And we weren't even together at that time, and I — just really wanted to get to the root of the problem. I wanted to fix things without having sex."

The following morning, Doe and Nguyen "tried to be normal" and went on a date. They did not talk about what had occurred the previous night because Doe "didn't want to admit that it had happened." The incident did not "feel real" to Doe, and she felt as if she were "walking through fog." She had not yet "processed" what Nguyen had done, but she felt something was wrong; she was "glued" to his bed after Nguyen left for work and had difficulty getting up. The two had consensual sex in the following days before Doe flew back to Illinois on August 29.

Nguyen and Doe stayed in contact through text messages and social media. Doe understood from conversations with Nguyen that they "were back together." Doe asked Nguyen "what we were," and Nguyen replied, " 'I guess we could date.' " Doe loved Nguyen and wanted to make it work, but "just couldn't completely tell where his head was at most of the time." She did not tell anyone about the rape because she felt ashamed.

5

In September 2019, Doe returned to South San Francisco after Nguyen asked her to help him move. She flew to South San Francisco with Nguyen's mother and stayed at his home. On the morning of September 26, 2019, Doe was awakened by Nguyen's phone receiving notifications from dating websites. Doe became upset that Nguyen was "cheating again." She tried to wake him by shaking him, and after he shooed her away, she pinched him hard on the back. When Doe began to scream and curse, Nguyen told Doe to stop and slapped her. He pinned her down to the bed and would not let go until her anger had subsided and she was just crying. Later that day, the couple started to have sex, but Doe was "crying and frozen again," and they did not have sex.

After Nguyen moved back to Illinois, he and Doe continued to see each other and have sexual relations. In October 2019, Doe left for an internship in Vietnam, and Nguyen visited her there in November. The couple had sex twice in Vietnam. When Doe returned from Vietnam, she learned in December 2019 that she had again contracted chlamydia, but she had not had sexual intercourse with anyone but Nguyen. Doe confronted Nguyen, but he told her he was clean.

On Doe's birthday in January 2020, Nguyen admitted to having cheated on her and giving her chlamydia. Nguyen's admissions "made it click" to Doe that he "was cruel enough to really tell me 'less crying, more moaning.' It made it clear to me that he was more than capable of continuing even if I'm begging him to stop. [¶] It's just that him admitting that was just all I really needed to know about what really happened to me in August of 2019." Sparked by Nguyen's admissions, Doe told friends she had been raped.

Nguyen and Doe saw each other less frequently after January 2020 during the COVID-19 pandemic. During a phone conversation in August 2020, Doe for the first time confronted Nguyen about the rape and asked how he could say " 'less crying more moaning' " to her. Nguyen denied the accusation and called her a liar. Doe also accused Nguyen of raping another girl from a prior relationship, and Nguyen said, "We don't talk about her; I'm not continuing this discussion with you," before ending the call.

Between August 2020 and December 2020, Nguyen and Doe were not dating, but they occasionally had sexual relations. In November 2020, Nguyen told Doe he wanted to end their sexual relationship. When Doe asked if he was seeing someone else, he did not say whether he was. Nguyen then stopped responding to Doe's messages and phone calls.

In December 2020, Doe unexpectedly ran into Nguyen while shopping. After exchanging polite greetings, Doe went to the parking lot and saw Nguyen walking to a car driven by a woman. Seeing the other woman made Doe realize the relationship was over. She had a panic attack and angrily called Nguyen "a rapist," "a liar," and "a cheat." Doe pushed, shoved, and slapped Nguyen. She ripped off his COVID-19 face mask and prevented him from getting into the vehicle.

After the incident, Doe began demanding that Nguyen reimburse Doe's mother $2,000 for the 2018 Asia trip. She also demanded $3,000 for "the hospitalization" and medication from contracting chlamydia. Nguyen did not respond to these demands.

In February 2021, Doe reported the August 2019 rape to police in Illinois, who contacted South San Francisco police. Doe did not previously consider reporting the rape because she feared she would not be believed, but

she had since found hope in other women's stories and did not want "the cycle" to "repeat" for other women.

On March 17, 2021, Doe, with the assistance of South San Francisco Police Sergeant Amy Sariotti, conducted a pretext call with Nguyen. Just before the call, Doe messaged Nguyen saying she needed "closure" and "had a couple of questions." In response, Nguyen wrote, "technically I'm not supposed to talk to you," and he stated he would only answer "depending on the question. If I choose not to answer the question, it's only because I don't know who will see my answers like if the text is screenshotted." He further stated, "I stay up at night thinking about what I have done and how I did things that you didn't deserve. I hope I'm able to answer the questions."

Doe suggested a phone call instead "[i]f that makes you feel better." In response, Nguyen asked where she was and if she was with anyone. Doe stated she was alone though Sergeant Sariotti was with her. Nguyen then requested to "see the questions first" and stated, "if I am able and comfortable enough to answer, I will call." Doe responded with the following message: "So do you remember that conversation we had in August last year? Ab[ou]t how you said I was making stuff up? That really fucked with me. I just want to know why you kept going even though I was cryinth [*sic*] my eyes out. Also, I know we had this conversation before too but why didn't you just tell me the truth about the STI . . . you knew how broken I was about it . . . you knew how badly I wanted to tear my body apart. Why did you lie about giving it to me?" Nguyen texted, "I think I can answer these questions" and called Doe.

During the pretext call, Doe asked Nguyen, "Can we stop pretending . . . that you didn't rape me? Can we stop pretending that you didn't lie to me about an STI? Can you stop pretending that you didn't hurt me? Can we just

8

stop pretending like right now, promise me?" Nguyen responded, "So to, to answer that question, I have to once again ask, where are you and are you alone?" Doe said she was at home and she "just want[ed] answers" before asking Nguyen whether he had "thought about it at all." Nguyen replied, "Of course I did. A lot." Doe asked, "You thought about the rape incident? Really?" Nguyen said, "I did and it's—it is not—I mean everything. I mean a lot of stuff not just that, but I've—I've thought a lot about the mistakes to the very, very beginning." Nguyen then discussed his struggles during and after college and in his employment, and Doe said, "you know that like you having problems doesn't give you the right to rape me, right? Or to give me the STI, or to lie, just because you've been hurt." Nguyen responded, "It does not give me the right to hurt you just because of my own problems. Yes. And I'm sorry for that. That my problems within myself affected someone as great as you."

Doe told Nguyen she was "so scared" because of "the things that you've done to me," including "the fact that you raped me and then I think, oh, but it's just me. And then I realize, no, it's not just me. It's not. It's my [Ate].[3] It's those girls in Cali. It's . . . not just me that you hurt. It's not just me that you spread an STI to. It's not just me that you raped. And honestly, when I saw your new girlfriend, she looked exactly the way that I did when I first started dating you. And I said, 'oh, oh my God, I don't want her to get raped too.'" Nguyen responded that "a lot of people have messaged me . . . [¶] [a]bout us. . . . But it's not about they messaging me. It's about, they were saying the exact same thing. And, you know, . . . I believe that with

---

[3]    The transcript of the pretext call described Doe's statement here as "<foreign language>" but she testified at trial that she used the word "Ate," which is a "title" "used very loosely for people we call older sister."

9

whatever I've done and to whoever other people, I, you know, I cannot be forgiven."

Around this point in the call, Nguyen said he heard an "echo" and then explained, "it's not that I don't trust you. It's just, I cannot really say, I'm not really allowed to talk to you." Nguyen also alluded to "court and legal stuff" and said, "So I had to talk to mine." Doe asked, "So your lawyer told you not to talk to him?" Nguyen responded, "He said anything I say can be used as evidence to turn around on me."

Later in the call, Doe expressed she kept having to tell herself that her feelings were "valid," and that "yes, this happened. . . . [D]id I really have an STI? Was my body really contaminated? Did he really give it to me? Would he really have continued even though I was crying? Would he have kept going, even though I said stop? . . . You know, it made me so mad to think about when I, the first time I tried to confront you about it? And I was like, Patric, 'why would you tell me "less crying and more moaning" '? And you said I made that shit up." Nguyen responded, "I mean, the reason why I agreed to having a conversation is because . . . [¶] I've accepted, came to terms . . . with the things I've done, and you know, I, I do think about it. I think about it a lot. . . . I know the things I've done cannot be forgiven and you deserve like, the answers of what, what I, whatever I can give you. Um, I really do believe that . . . you are a great person that I basically treated very horribly."

Near the end of the pretext call, Nguyen acknowledged he owed Doe and her mother money and said he was saving up to pay them back.

### 2. Sergeant Sariotti

Sergeant Sariotti testified as an expert in sexual abuse and domestic violence relationship dynamics. She had been a police officer for nearly 17

10

years and specialized in sexual assault and domestic violence throughout her career. She attended trainings and courses in domestic violence and sexual assault and became the in-house instructor in her department.

Sariotti did not find it unusual that Doe was reporting a 2019 rape in 2021 because often times, victims of sexual assault or domestic violence do not want to see their significant other get into trouble, or they have traumatic feelings about the event, or they are not "ready" to report. Sariotti explained victims of domestic violence may act in counterintuitive ways because "there is a cycle of violence that occurs within domestic-violence relationships. Within that cycle, there is also a denial portion. [¶] They start with some sort of turmoil in their relationship that then goes to the actual event that would occur, which would be either physical violence, sex abuse. [¶] And then, there is also the make-up phase or like the honeymoon phase" which "again is the denial phase. [¶] In those instances, a victim of domestic violence, they may feel disbelief. They don't want to believe that the person that they are in a relationship with would be committing those types of abuses to them. [¶] So, they may be in denial and hope that they would stop what they were doing and give them a second chance and continue on with their relationship."

Sariotti further explained that "[d]elayed disclosure can happen in physical domestic-violence instances or sex-abuse instances where . . . they want to believe that their abuser will change. They want to give them another chance. [¶] They may have some type of gaslighting going on where the abuser manipulates them to think they are the cause of what happened or try to get them to believe that that didn't happen, that it is in their head, that it may have occurred." Asked whether it was common for there to be a long delay before disclosure, Sariotti said, "Yes. They could be afraid that, if

11

they report it, it will make the abuser more upset. Maybe there is some type of financial stability. They are worried about, you know, if the abuser is the one that makes more money, how are they going to pay the bills." Sariotti further explained that "[o]ften times, the victim will hope that they will change because they do love them. [¶] The victim is in disbelief because the abuser loves them. And often times, you can still love somebody even though they have hurt you. [¶] So, having spoken to victims, they explain that they love them before, they love them during it, and they still love them as a person after even though they hurt them."

In maintaining it was not inconsistent for a couple to have consensual sex after an in-relationship sexual assault, Sariotti explained that it sometimes takes the victim "longer to process. Not every victim is the same. Just like not every abuser is the same. So they may not have processed the incident occurred. And they go on their everyday life. [¶] And maybe the next day, the abuser and the victim go on a date together or have sexual relations with each other. That is not uncommon." Sariotti further explained that sexual assault within a relationship is different from assault by a stranger because during in-relationship assaults, "you see your abuser every day or every so often. So, you may get reminders of what happened and want to push past it. [¶] Whereas with a stranger sexual assault, that is usually the only day you may see them unless you happen upon them in the courtroom later on. . . . [¶] . . . [W]hen you are in that relationship with your abuser, the victim, often times, may be thinking about the abuse that happened. But then, there is that honeymoon period . . . where the abuser then comes and . . . sweeps them off their feet again and the cycle continues."

The prosecutor concluded the direct examination of Sariotti with two questions. First, the prosecutor asked whether it was "common" for victims

of in-relationship rape to continue in the relationship hoping that it could go back to "the good times," and Sariotti said "Yes." The prosecutor then asked, without any objection from the defense, whether Sariotti had learned "anything unusual" during her investigation "that caused [her] to have any doubt about the veracity of the claims that Ms. Doe was making as to her rape," and Sariotti answered, "No."

During cross-examination, the defense asked Sariotti to confirm her statement to the prosecution that she had not learned anything causing her to doubt Doe's veracity, which she did. The defense also asked if Doe had alleged any threats of physical violence, and Sariotti responded, "I know there was physical abuse."

### 3. Nguyen

Nguyen testified in his defense, as follows. He and Doe had broken up and gotten back together so many times that the lines became blurred about whether they were or were not in a relationship. He was often unhappy in the relationship and told Doe many times he wanted to break up, but she could call him a coward and say he was running from his problems, making him feel trapped in the relationship. He perceived all of their sexual encounters as mutually consensual. Doe never told him to stop or said, "no, I don't want to do this." During the August 27, 2019, incident, Nguyen and Doe talked for about 15 minutes, and Nguyen thought they had made up and he started kissing her. He started undressing her, and she helped by positioning her body so he could do so. He used no force to get her lay down and remove her clothes, and she did not object or tell him to stop. He never said, " 'less crying, more moaning.' " They had sex again over the next two days.

13

The first time Doe accused him of raping her was during the August 2020 phone call, and his denial caused the conversation to turn into a screaming match. She accused him of rape again in December 2020, when she saw Nguyen at a store with his girlfriend. When Nguyen tried to leave, Doe pushed and shoved him, pulled off his facemask, and slapped him. As Nguyen and his girlfriend tried to drive away, Doe jumped in front of the car, but a security guard pulled her away. The next day, Doe began sending Nguyen demands for money, but Nguyen did not respond.

The two had no contact until the March 2021 pretext call. Nguyen testified he agreed to the call in order to appease Doe, which was part of a pattern in their relationship. He did not want to say much because he was concerned that Doe would share their conversation. He had been receiving numerous messages about their relationship from others, including strangers, and he wanted to keep the matter private. When he admitted "mistakes" and said he was a "bad person," he was referring to giving Doe chlamydia, having contact with other women while dating her, and lying about it. As for Doe's rape allegations, Nguyen said he did not want to make her angry with a direct denial and have another screaming match. He was also confused about what occasion she was talking about; he thought she was referring to the time in September 2019 when they attempted to have sex but stopped because Doe was crying.

## B. Verdict and Sentence

The jury deliberated for just a few hours before returning a guilty verdict. During its deliberations, the jury requested a transcript of the pretext call and the text messages preceding it. Later, the jury requested a readback of the last five minutes of the prosecutor's cross examination of Nguyen, which targeted his nondenials of the Doe's rape and other

accusations and included questioning about his attorney's advice to remain silent.

In June 2024, the trial court sentenced Nguyen to the lower term of three years in state prison and ordered him to pay, among other things, $6,511.54 in actual restitution to Doe.

## DISCUSSION

### A. Expert Testimony Under Evidence Code Section 1107

Nguyen contends the trial court abused its discretion by permitting Sergeant Sariotti to testify as an expert on sexual abuse and domestic violence relationship dynamics because (1) there was no foundational evidence that the relationship between Nguyen and Doe involved intimate partner battering or any issue beyond common experience; and (2) Sariotti's testimony regarding Doe's credibility invaded the province of the jury. As we shall explain, the court did not abuse its discretion in admitting Sariotti's expert testimony.

#### 1. *Additional Background*

The prosecution sought to admit Sariotti as an expert "to help the jury understand the effects of physical abuse in the domestic violence context, and subsequent behavior one might expect to see in a victim, including but not limited to, delayed disclosure and a continued relationship with the perpetrator." The prosecution argued that Sariotti's opinions would "bolster the credibility of [Doe's] statements, and help the jury understand why she may have continued to stay in a relationship with [Nguyen], had conflicted feelings about him and failed to report what occurred when it happened." The trial court allowed Sariotti to testify but admonished that she could not give opinions regarding the specific facts of the case and could only "generally speak[] about domestic violence and sexual-assault relationships."

15

## *2. Foundation*

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) "An abuse of discretion will be 'established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

Expert opinion testimony is generally admissible if the subject matter of the testimony is "sufficiently beyond common experience" and "would "assist the trier fact." (Evid. Code, § 801, subd. (a).) "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).) "For purposes of this section, 'abuse' is defined in Section 6203 of the Family Code, and 'domestic violence' is defined in Section 6211 of the Family Code and may include acts defined in" various enumerated Penal Code sections, including section 261 (forcible rape). (Evid. Code, § 1107, subd. (c).)

"The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness." (Evid. Code, § 1107, subd. (b).) There are "two major components to a relevance analysis in this context. First, there must be sufficient evidence in the particular case to support a

contention that [intimate partner battering] applies to the woman involved. [Citation.] Second, there must be a contested issue as to which [intimate partner battering] testimony is probative." (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592.)

Expert testimony on intimate partner battering may "play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248 (*Bledsoe*).) For instance, in a number of cases, an alleged rapist "has suggested to the jury that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault." (*Id.* at p. 247.) Expert testimony "to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100.)

Here, there was no dispute that Sariotti was a qualified expert on sexual abuse and domestic violence dynamics. Her testimony was offered to elucidate why victims of domestic violence may act in counterintuitive ways, like staying with their abuser and not immediately reporting sexual abuse. This testimony was relevant to Doe's credibility, as the evidence demonstrated that more than a year had passed between the charged rape and Doe's report to police, during which she continued to maintain a romantic

17

and physical relationship with Nguyen. (See *Bledsoe, supra*, 36 Cal.3d at p. 247.)

Nguyen insists there was insufficient foundational evidence that Doe was a victim of intimate partner battering because there was no "pattern of sexual assault or domestic abuse" attendant to the charged August 2019 rape. Nguyen posits that the charged rape did not itself involve "domestic violence" within the meaning of section 13700; the later slap incident in September 2019 had no relationship to Doe's delayed reporting; and Doe's testimony that Nguyen threw "some small objects" in anger was insufficient because Doe "did not say that either his anger or the objects were directed at her." We are unpersuaded by these points.

Importantly, the law does not require a pattern of prior domestic violence as the foundation for expert testimony on the effects of intimate partner battering. Even a single incident of abuse may warrant expert testimony to assist the jury in understanding the behavior of a victim of domestic violence. (*People v. Brown* (2004) 33 Cal.4th 892, 895–896 (*Brown*).)[4] Evidence Code section 1107 contains no suggestion that a batterer is permitted "one free episode of domestic violence before admission of

---

[4]     As Nguyen points out, the holding in *Brown* was based on Evidence Code section 801, not Evidence Code section 1107. The court explained that it faced a "conundrum" in that Evidence Code section 1107 "speaks of expert testimony 'regarding battered women's syndrome," which "pertains to women who have been subjected to an extended period of abuse" (*Brown*, 33 Cal.4th at p. 904), but the court recognized that "[p]ersons who only have been assaulted once are still 'victims of domestic violence.'" (*Id.* at p. 905.) Concluding the expert testimony was admissible under Evidence Code section 801, *Brown* sidestepped the question whether the testimony was also admissible under Evidence Code section 1107. (*Brown*, at p. 896.) That said, Nguyen's attempt to distinguish *Brown* ultimately fails, as *Brown*'s reliance on Evidence Code section 801 simply provides an alternate rationale for the admissibility of Sariotti's testimony here.

evidence to explain why a victim of domestic violence may make inconsistent statements about what occurred and why such a victim may return to the perpetrator." (*People v. Williams* (2000) 78 Cal.App.4th 1118, 1129 (*Williams*).)

Moreover, even assuming evidence of a pattern of domestic violence was necessary to lay a foundation for Sariotti's testimony, there was sufficient evidence here. Doe testified Nguyen had angrily thrown objects "at me" in the past. She further testified Nguyen raped her in August 2019 and used physical violence against her (e.g., slapped her and pinned her down) in September 2019. (See *People v. Caceres* (2019) 39 Cal.App.5th 917, 921–922 [domestic violence includes "sexually assaulting," "striking," and "disturbing the peace of the other party"].) The trial court could reasonably conclude these acts, taken together, formed a pattern of domestic violence that provided sufficient foundation for Sariotti's testimony.

Nguyen is wrong in insisting that the requisite foundation was lacking because the charged offense did not involve "domestic violence" within the meaning of section 13700. First off, for purposes of Evidence Code section 1107, "domestic violence" includes the act of forcible rape. (See Evid. Code, § 1107, subd. (c), citing § 261.) Second, Evidence Code section 1107 makes clear that the applicable definitions of "abuse" and "domestic violence" derive from Family Code sections 6203 and 6211, not section 13700. (See Evid. Code, § 1107, subd. (c).) Though the Family Code definitions share similarities with section 13700, there are meaningful differences. Specifically, Family Code section 6211 defines "domestic violence" to include "abuse perpetrated against" "[a] person with whom the respondent is having or has had a dating or engagement relationship" (Fam. Code, § 6211, subd. (c)), and in turn, Family Code section 6203, subdivision (a), defines "abuse" as

19

including "intentionally or recklessly cause or attempt to cause bodily injury"; "[s]exual assault"; "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or another; and "engag[ing] in any behavior that could be enjoined under Family Code section 6320" (Fam. Code, § 6203, subd. (a)(2)). In contrast, section 13700's definitions of "domestic violence" and "abuse" do not include sexual assault or enjoinable behavior under Family Code section 6320 (e.g., "molesting," "striking," and "sexually assaulting"). Nguyen makes no attempt to argue that the August 2019 incident would not constitute sexual assault or enjoinable behavior for purposes of the Family Code definitions applicable to Evidence Code section 1107.[5]

Nguyen further contends there was no foundation for Sariotti's testimony on delayed disclosure because Doe was sufficiently clear on her reasons for not reporting earlier. Namely, he says, Doe "explained she did not see the August 2019 event as a rape at the time it occurred," and she only began to view it as rape after Nguyen admitted in December 2019 that he had given her chlamydia. But it was precisely this type of delayed realization that Sariotti sought to elucidate through her testimony about victims of in-relationship sexual assault and why they may require more time to process the abuse.

Finally, Nguyen argues Sariotti's testimony did not involve a subject beyond common experience, as the prosecutor argued to the jury that "common sense tells us, when you love somebody, you are willing to overlook

---

[5]    Moreover, and in any event, Nguyen's attempt to rely on section 13700's definition of "domestic violence" is unavailing. As discussed more fully in part B.2, *post*, we conclude there was sufficient evidence in this case that the charged offense of forcible rape constituted domestic violence within the meaning of section 13700.

things that they are doing that might be hurtful, that might be criminal." But "the admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission[.] . . . [E]ven if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300.)  Here, even if an appeal to common sense could help explain some of the dynamics of the relationship between Nguyen and Doe, that does not mean Sariotti's significant experience with victims of domestic violence and sexual assault provided no assistance to the jury.

In sum, the trial court reasonably concluded there was sufficient foundational evidence that Doe was a victim of intimate partner battering. Accordingly, it did not err in admitting Sariotti's expert testimony on the effects of sexual abuse and domestic violence.

### 3.  *Invading the Province of the Jury*

Nguyen argues Sariotti's testimony went beyond rehabilitating Doe's credibility and invaded the province of the jury by "veer[ing]" into an opinion about Nguyen's guilt.  In particular, Nguyen highlights that Sariotti, the reporting police officer in this case, stated during her testimony that she "[knew] there was physical abuse" in Nguyen and Doe's relationship.  Nguyen also complains that Sariotti rendered a legal opinion that "verbal arguments" are "part of domestic abuse"; that she testified nothing about the case caused her to doubt the veracity of Doe's claims; and that her testimony "create[d] the inference that, because Doe behaved like a domestic violence victim, she *was* a domestic violence victim."

We understand Nguyen's claim that Sariotti invaded the province of the jury as challenging specific portions of her testimony, not the overall

decision to admit Sariotti as an expert on sexual assault and domestic violence (which, as discussed above, was an appropriate exercise of the trial court's discretion).[6]  As the record reflects, Nguyen did not timely object to those specific portions of Sariotti's testimony that he now claims invaded the province of the jury, and in one instance, the defense asked her to confirm her testimony during cross-examination.  Nor did Nguyen ask the trial court to strike the challenged statements or admonish the jury to disregard them.  Accordingly, he has forfeited this claim of error on appeal.  (*People v. Partida* (2005) 37 Cal.4th 428, 433–434 [timely and specific objection to admission of evidence is necessary in criminal cases]; *People v. Bemore* (2000) 22 Cal.4th 809, 845–846 [issue waived on appeal where trial court had no opportunity to consider objection and give appropriate admonitions].)

In any event, we find no basis for relief.  Expert testimony under Evidence Code section 1107 "is limited to discussion of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1100.)  Though such testimony may be used to counter a challenge to an abuse victim's credibility, "the jury cannot be led to engage in the leap from: (1) many victims of sexual abuse do not disclose the abuse because they hold the abuser in high esteem; (2) the witness failed to disclose the sexual abuse; (3) the witness exhibits the same behavior as a class of actual victims of sexual abuse; therefore, (4) the witness was in fact sexually abused." (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64 (*Clotfelter*).)

---

[6]  Indeed, in admitting Sariotti's testimony, the trial court explicitly ruled she was not permitted to give opinions regarding the specific facts of the case and could only "generally speak[] about domestic violence and sexual-assault relationships."

22

Nguyen maintains the prosecution used Sariotti to make the same improper "leap" proscribed in *Clotfelter*. First, Nguyen outlines various portions of Sariotti's testimony regarding domestic abuse relationships and victims, e.g., that such relationships often involve a cycle of turmoil followed by a make-up phase and victim denial; that victims often do not report the abuse hoping their abuser will change; that abusers may "gaslight" victims to believe something did not happen; that victims often "may not have processed" the abuse occurred. Next, Nguyen compares these remarks to Doe's testimony recounting similar events and dynamics in her relationship with Nguyen, such as her experience of not immediately "process[ing]" that the rape had occurred. From this, Nguyen concludes the prosecution impermissibly used Sariotti's testimony to create the inference that because Doe behaved like a domestic violence victim, she was one.

We are not convinced. The cited portions of Sariotti's testimony appropriately pertained to observations about domestic violence victims in general based on Sariotti's experience and training. As discussed, this testimony was relevant to rehabilitating Doe's credibility by dispelling myths about domestic violence victims. (*Bledsoe*, *supra*, 36 Cal.3d at p. 247.) That Sariotti's general opinions tracked the evidence in this case does not mean her comments constituted improper opinions on the specifics of this case, or that the prosecution attempted to prove the rape simply by Doe's behavioral similarities to other victims. (Cf. *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [expert may express opinions based on hypothetical questions that track the evidence].) Indeed, the fact of rape was proven through Doe's testimony about the August 2019 incident itself.

Nguyen also highlights the prosecutor's question to Sariotti as to whether there was "anything unusual about what you learned throughout

23

your investigation about this case that caused you to have any doubt about the veracity of the claims that Ms. Doe was making as to her rape?" Sariotti responded, "No." Nguyen argues this "overtly encouraged the jury to substitute the officer's expertise and determination of witness credibility where it was the jury's job alone." We again are unpersuaded.

Though Nguyen challenges this testimony on appeal, we note the defense at trial had affirmatively asked Sariotti to confirm her testimony on this particular point. In any event, Sariotti did not testify that Nguyen was guilty, tell the jury whom to believe, or direct the jury toward a specific conclusion on any element of the charged crime. (*People v. Prince* (2007) 40 Cal.4th 1179, 1127.) The remark in question came immediately after Sariotti testified about the differences between sexual assault by a stranger and in-relationship sexual assault. Sariotti explained that victims of intimate relationship sexual assaults often take "longer to process" the assault because they must "see [their] abuser every day . . . and want to push past it." Sariotti further testified that with in-relationship sexual assaults, there is often a "honeymoon period" in which the abuser "sweeps [the victims] off their feet again and the cycle continues." Sariotti agreed it is common for people in these types of relationships to continue for years hoping the relationship could go back to the good times. It was at this point that Sariotti agreed there was nothing in her investigation that caused her to doubt Doe's veracity. In other words, Sariotti told the jury that delayed reporting and staying with an abuser are not uncommon behaviors in domestic violence victims, and nothing in her investigation suggested Doe's circumstances were any different. Viewed in context, Sariotti's responsive remark was geared towards rehabilitating Doe's credibility, which was within the appropriate scope of her expert testimony.

Moreover, " '[t]here is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507–508 [gang expert permissibly testified that defendant was member of particular gang and his activities were undertaken on behalf of the gang].) " 'Expert opinions which invade the province of the jury are not excluded because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful). "[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. 'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' [Citation.]" [Citations.] In other words, when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not aid the jurors, it supplants them.' " (*People v. Rouston* (2024) 99 Cal.App.5th 997, 1010, italics omitted (*Rouston*).)

Even assuming Sariotti's investigative observation might be viewed as opinion testimony touching on the ultimate issue in this case, the jury instructions adequately ensured that Sariotti's testimony would not supplant the jury's role in determining Nguyen's guilt or innocence. The trial court instructed the jurors that they were "not required to accept" Sariotti's opinion "as true or correct" and that the "meaning and importance" of her opinions were for the jury to decide. The court further admonished the jurors that they "must decide whether information on which the expert relied was true and accurate," that they may "disregard any opinion that" they found "unbelievable, unreasonable, or unsupported by the evidence," and that they "*alone* must judge the credibility or believability of the witnesses." (Italics added.) Consequently, the jurors knew that Sariotti's testimony was not

25

binding on them, and that they were free to accord the opinion the weight it deserves because they alone were the final judges of Doe's credibility on the ultimate issues in the case. (See *Prince*, *supra*, 40 Cal.4th at p. 1227.) On this score, we note that nothing in the parties' closing arguments suggested otherwise.

Finally, Nguyen challenges Sariotti's testimony that she "[knew] there was physical abuse" in Nguyen and Doe's relationship and that "verbal arguments" are "part of domestic abuse". But even assuming the impropriety of these statements (see *People v. Sanchez* (2016) 63 Cal.4th 665, 676 [expert may not relate case-specific facts about which expert has no independent knowledge]; *Rouston*, *supra*, 99 Cal.App.5th at p. 1010 [expert may not give opinions on questions of law]), we are not convinced Nguyen was prejudiced. On the record before us, we conclude it is not reasonably probable the jury would have reached a different result more favorable to Nguyen absent the brief portions of Sariotti's testimony cited above, as Doe's testimony furnished ample evidence of physical domestic violence in the relationship. (See *Rouston*, at p. 1016 [applying *People v. Watson* (1956) 46 Cal.2d 818 standard of prejudice to erroneous admission of evidence in violation of state law].)

### B. Propensity Evidence

Nguyen argues the evidence that he slapped Doe in September 2019 should not have been admitted under Evidence Code section 1109 to show his propensity to commit rape because the charged offense of forcible rape was not one involving "domestic violence" within the meaning of that statute. Specifically, Nguyen maintains there was no evidence that the act of sexual intercourse underlying the charged offense was accomplished by means of "intentionally or recklessly causing or attempting to cause bodily injury, or

26

placing another person in reasonable fear of imminent serious bodily injury," as contemplated under section 13700, subdivisions (a) and (b). Nguyen further argues the September 2019 slap incident had no tendency in reason to prove his propensity to commit rape because the slap occurred after the charged offense. We reject these contentions and conclude the propensity evidence was properly admitted.

### 1. Additional Background

Relying on Evidence Code section 1109, the prosecution moved in limine to admit evidence of the September 2019 incident—when Nguyen slapped Doe's face after she confronted him about his infidelity—as an "other act[] of domestic violence." In the prosecutor's words, the evidence was "incredibly probative to how [Nguyen] was treating [Doe] during this time frame. Further, in the pretext call, he makes several vague comments about 'hurting' her. The probative value is found in the fact that [Nguyen] thinks he has the right to physically dominate [Doe] and to force her to comply to his wishes. This includes when she does not want to have sex and includes when she is angry and accusing him of cheating. He is willing to put his hands on her to accomplish his goals."

Over the defense's objection, the trial court granted the motion. The court observed that the situation was "unique compared to the case law [in] that it actually happened after the incident. . . . [¶] Most case law discuss prior acts. However, [Evidence Code section] 1109 doesn't differentiate. It just says acts of domestic violence." The court agreed that both the charged crime and the uncharged act were "acts of domestic violence . . . and they are both violent in a sense. But one is sexually related, and one is not."

The trial court instructed the jury on propensity evidence as follows: "The People presented evidence that the defendant committed domestic

violence that was not charged in this case.  Specifically: a slap of . . . Doe's face in a hotel room on September 19, 2019.  [¶] 'Domestic violence' means abuse committed against an adult who is a person with whom the defendant currently has, or previously had, a dating relationship.  [¶] 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of [imminent] serious bodily injury to himself or herself or to someone else.  You may only consider this evidence if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence.  [¶] Proof by a preponderance of the evidence is a different burden of proof than beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed this uncharged domestic violence, you may consider that evidence and weigh it together with all the other evidence received during the trial to help you determine whether the defendant committed count 1.  [¶] Remember however, that evidence of uncharged domestic violence is not sufficient alone to find the defendant guilty of count 1.  The People must still prove each charge and allegation of count 1 beyond a reasonable doubt."

### 2. Analysis

Evidence Code section 1109 is a statutory exception to the prohibition against evidence of character or habit to show propensity to commit a charged crime.  (See Evid. Code, §§ 1101, subd. (a), 1109.)  With exceptions not relevant here, Evidence Code section 1109 states that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is

28

not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).) The evidence of the uncharged offense " 'must have some tendency in reason to show that the defendant is predisposed to engage in conduct of the type charged.' " (*People v. Jandres* (2014) 226 Cal.App.4th 340, 355, italics omitted.)

"The admissibility of evidence of domestic violence is subject to the sound discretion of the trial court, which will not be disturbed on appeal absent a showing of an abuse of discretion." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138 (*Poplar*).) " ' "So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it." ' [Citation.] We resolve all conflicts in the evidence in favor of . . . the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings." (*Herriott v. Herriott* (2019) 33 Cal.App.5th 212, 223.)

We conclude the trial court did not abuse its discretion in concluding the charged crime of forcible rape was "an offense involving domestic violence" within the meaning of Evidence Code section 1109, subdivision (a)(1). For purposes of this statute, " '[d]omestic violence' has the meaning set forth in Section 13700 of the Penal Code." (Evid. Code, § 1109, subd. (d)(3).)[7] Section 13700, subdivision (b), defines "domestic violence" in

---

[7] Evidence Code section 1109 also incorporates the definition of "domestic violence" set forth in Family Code section 6211, but only if the trial court has conducted a "hearing" pursuant to Evidence Code section 352, "which shall include consideration of any corroboration and remoteness in time" and "the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).) The record here does not reflect that the trial court held the requisite hearing under Evidence Code section 352 (and certainly not one that included consideration of corroborating evidence) in connection with the admissibility of the evidence of the

29

relevant part as "abuse" committed against a person with whom a suspect is in a dating relationship. (§ 13700, subd. (b).) In turn, "abuse" is defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (*Id.*, subd. (a).)

The charged offense of forcible rape is defined in relevant part as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator" that "is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) In *Poplar*, the court held that "[t]he definition of domestic violence/abuse ("reasonable apprehension of imminent serious bodily injury to . . . herself") encompasses the definition of rape ('fear of immediate and unlawful bodily injury on the person'). Defendant was charged with an offense involving domestic violence, that is, rape. . . . [R]ape is a higher level of domestic violence, a similar act of control." (*Poplar*, *supra*, 70 Cal.App.4th at p. 1139.)

Nguyen argues *Poplar* is distinguishable because it involved a relationship with a history of physical violence and threats, whereas the instant case "did not involve any prior physical violence in the admittedly rocky relationship, and no evidence that the actual act of intercourse . . . was accomplished by physical force, and no evidence of any basis for Doe to fear physical harm from [Nguyen]." Nguyen insists that Doe "gave physical assistance to [his] efforts to disrobe her," and that although she testified she was "scared," she said it was because "he was doing something I didn't want him to do," not because she feared harm or violence. We are not persuaded.

uncharged offense. Thus, Family Code section 6211's definition of "domestic violence" appears inapplicable here.

Nguyen's self-serving characterization of the evidence regarding his relationship with Doe and the details of the August 2019 rape is insufficient to demonstrate the trial court erred as a matter of law in concluding the rape was an act of domestic violence. As the record shows, Doe testified she told Nguyen she did not want to have sex during the August 2019 incident, but he nonetheless tugged at her, pulled her into position, lifted her hips and her back to remove her clothes, and began having sexual intercourse with her despite the fact she was crying and "frozen," and had repeatedly asked him to stop because she was in pain. Nothing in Doe's testimony suggested otherwise.

Notably, "the Legislature did not intend the term 'force,' as used in the rape statute, to be given any specialized legal definition." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023.) Lay meanings of "force" that have been used in the case law include " 'to press, drive, attain to, or effect as indicated against resistance.' " (*Id.* at p. 1023.) " '[T]o establish force within the meaning of section 261, . . . the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' " (*People v. Griffin*, at pp. 1023–1024.) Moreover, "the kind of force necessary need not be substantially different or greater than the physical force normally inherent in an act of consensual sexual intercourse." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 99, italics omitted.) On the record before us, the evidence amply supports the conclusion that the act of intercourse was accomplished by force.

We are likewise unconvinced by Nguyen's contention that the August 2019 rape did not meet the definition of "abuse" under section 13700, subdivision (a). Doe testified that during the rape, she was frozen, crying,

and in pain, and that Nguyen said, " 'less crying, more moaning.' "  As this evidence could reasonably support the inference that Nguyen was aware he was causing Doe physical pain and fear but continued to force sexual intercourse upon her anyway, it could also reasonably support the inference that he committed an act of "abuse" under section 13700, subdivision (a), by intentionally or recklessly causing or attempting to cause bodily injury to Doe.  This, in turn, supported the trial court's determination that the alleged rape constituted "domestic violence" for purposes of allowing propensity evidence under Evidence Code section 1109.

Finally, we are not persuaded by Nguyen's contention that the sequence of the charged and uncharged offenses undermines the logical relevance of the propensity evidence.  Nguyen offers no authority to support his contention, and we, like the trial court, see no reason why a person's predisposition to commit domestic violence cannot logically be inferred from uncharged acts of domestic violence occurring subsequent to the charged offense, particularly in a case like this involving an on-again-off-again dating relationship.  Either way, what is demonstrated by the evidence is that domestic violence has repeated during the relationship.

## C. Fifth Amendment Privilege Against Self Incrimination

In March 2021—more than a year before the information against Nguyen was filed in August 2022—Doe, with the assistance of Police Sergeant Sariotti, conducted a pretext call with Nguyen during which Nguyen did not deny Doe's rape accusations.  On appeal, Nguyen argues that because an attorney had previously advised him not to say anything to Doe, the trial court violated his Fifth Amendment privilege against self-incrimination by admitting the pretext call evidence and by instructing the jury it could consider his failure to make explicit denials as adoptive

admissions.  Nguyen further argues the Fifth Amendment prohibited the prosecution from cross-examining him on his lawyer's advice and from arguing to the jury about his silence and nondenials.

### 1. Additional Background

At trial, the prosecutor cross-examined Nguyen about his reference during the pretext call to "anything I say" being "used as evidence to turn around on [him]."  When asked who gave him this advice, Nguyen answered, "previous attorney."  Asked whether the reference to "evidence" was in regard to "criminal cases," Nguyen responded, "It doesn't have to be criminal cases," and he explained he was concerned Doe might publicly share their discussions and how it would affect "what other people think about me."

The prosecutor further elicited Nguyen's testimony that Doe referred to "rape" during the pretext call numerous times, but that he never said, "I don't know what you are talking about," or questioned why she was calling it "rape."  The prosecutor asked Nguyen whether he meant he could "not say anything about the rape right now, because I don't want it to be used against me," and Nguyen responded, "I don't want to talk.  Like I don't want to say too much to her in general.  That's why everything—all the answers are superficial."  The prosecutor pressed further, "Why can't you say more about cheating, on giving her an STI, and lying to her?  Those aren't criminal offenses.  [¶] Why can't you say anything about them?  Why would your lawyers advise you not to say anything about those things?"  Nguyen responded, "I just mean as a broad spectrum."

After playing a clip of the pretext call, the prosecutor noted "Mr. Nguyen, that was a long pause.  It was about a 45-second pause where you don't say a word after she says to you 'it made me so mad the first time I tried to confront you and I told you about "less crying, more moaning," and

you said I made that shit up.' [¶] Not one time, in those 45 seconds, do you say I stopped when you started crying; right? [¶] A. Correct. [¶] Q. Not one time do you say what are you talking about less crying, more moaning; I never said those words; right? [¶] A. Correct." On redirect, Nguyen explained he did not deny the accusations because he had it in mind that he had already denied the rape claim in August 2020, and he wanted to avoid another heated conversation like that phone call.

The jury was instructed on adoptive admissions as follows: "If you conclude that someone made a statement outside of court that accused the defendant of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in his presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose. [¶] During the trial, certain evidence was admitted for a limited purpose. Evidence of 'other rapes' is only relevant to an adoptive admission of the rape that Defendant is charged with. You may consider the evidence for only that limited purpose and for no other."

During closing arguments, the prosecutor argued that Nguyen's failures to explicitly deny Doe's accusations constituted adoptive admissions.

### 2. *Analysis*

Nguyen concedes he forfeited his Fifth Amendment claim by failing to object on this ground to the admission of the pretext call evidence, the prosecutor's arguments and questions on Nguyen's silence, and the adoptive admission jury instruction.  (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 471 [failure to object to jury instruction forfeits appellate claim of error]; *People v. Adanadus* (2007) 157 Cal.App.4th 496, 512 [requiring timely objection to preserve prosecutorial misconduct claim]; *People v. Barnum* (2003) 29 Cal.4th 1210, 1224-1225, fn. 2 [claim based on privilege against self-incrimination may be forfeited].)  We elect to address the issue in order to forestall a petition for writ of habeas corpus based on a claim of ineffective assistance of counsel.  (See *Williams*, *supra*, 78 Cal.App.4th at p. 1126.)

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  (U.S. Const., 5th Amend.)  In *Griffin*, *supra*, 380 U.S. 609, the United States Supreme Court held the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  (*Griffin*, at p. 615.)  As the high court explained, comment on a criminal defendant's failure to testify "is a penalty imposed by courts for exercising a constitutional privilege.  It cuts down on the privilege by making its assertion costly. . . .  What the jury may infer, given no help from the court, is one thing.  What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another."  (*Id.* at p. 614.)

As our Supreme Court recognizes, "[t]he rationale of *Griffin* implicitly proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement if the defendant was asserting his constitutional privilege against self-incrimination."  (*People v. Cockrell* (1965)

63 Cal.2d 659, 669–670.) Though *Griffin*'s ban "does not extend" to prosecutorial comments "on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses," *Griffin* may prohibit prosecutorial comments on "the absence of evidence that only the defendant's testimony could provide." (*People v. Brady* (2010) 50 Cal.4th 547, 565–566 (*Brady*).)

The adoptive admissions exception to the hearsay rule, codified in Evidence Code section 1221, implicates *Griffin* concerns. Under this exception, "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) The rationale for adoptive admissions has been stated thusly: "In general, where a statement accusing a defendant of a crime or tending to connect him with its commission has been made to him, and he has remained silent or has given an equivocal or evasive reply, evidence of the statement and of his conduct is admissible on the theory that the natural reaction of an innocent man would have been to make a denial and that, therefore, his failure to deny may be regarded as giving rise to an inference of acquiescence in the truth of the statement or as indicating a consciousness of guilt." (*People v. Abbott* (1956) 47 Cal.2d 362, 373.) However, "where the defendant remains silent under a claim of right to which he is legally entitled, such an inference is not justified and the evidence may not be admitted." (*Ibid.*)

The People raise a threshold contention that the Fifth Amendment was not implicated here because "there was no state agent compelling or coercing [Nguyen] to speak with Doe during the pretext call." And relying on *People v. Leonard* (2014) 228 Cal.App.4th 465 (*Leonard*) and *People v. Thomas* (2017)

15 Cal.App.5th 1063 (*Thomas*), the People also emphasize that courts generally admit pretext calls into evidence.

We have difficulty endorsing the People's broad assertion that the Fifth Amendment is categorically inapplicable in the absence of ostensible government coercion. Unlike the situation here, the People's authorities involved coerced confessions. (See, e.g., *Colorado v. Connelly* (1986) 479 U.S. 157, 167 ["coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' "]; *People v. Mayfield* (1997) 14 Cal.4th 668, 759 [same].) But a bar against coerced confessions is qualitatively different than the inferential prohibition recognized in *Griffin*, which pertains to an accused's mere silence. The People offer no authority supporting their suggestion that an accused must invoke the right to silence in the face of known government coercion in order for the *Griffin* rule to apply.[8] *Leonard* and *Thomas* do not assist the People on this score, as neither involved a challenge to the admissibility of pretext call evidence on Fifth Amendment (or any other) grounds.

As Nguyen aptly observes, the Supreme Court in *People v. Simmons* (1946) 28 Cal.2d 699, 715–716 (*Simmons*), cited "advice of counsel" as one "form[] of restraint" that "might bar a free response" by a person accused of a crime and therefore may not "give rise to an inference of acquiescence or guilty consciousness." Relying on *People v. Potter* (2021) 66 Cal.App.5th 528, the People counter that advice of counsel does not constitute a "restraint on

_____

[8] Indeed, where an accused has a valid Fifth Amendment right not to testify, it is "improper to require him to invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation. An adverse inference, damaging to the defense, may be drawn by jurors despite the possibility the assertion of privilege may be based upon reasons unrelated to guilt." (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554.)

37

freedom of movement." *Potter*, however, merely defined when an interrogation occurs in a custodial context, an issue having no application here.

Furthermore, the People's emphasis on the presence or absence of government coercion fails to account for the rationale underlying adoptive admissions, which is that "the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial." (*Simmons, supra*, 28 Cal.2d at p. 712.) That inference is only justified where the person " 'is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and *which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution.*' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 (*Riel*), italics added.)

An accused's express invocation of the right to remain silent on the advice of counsel is precisely a circumstance that may lend itself to the inference that the accused's silence in the face of accusations stems merely from the assertion of that right. If anything, it is the most natural inference to be drawn from the circumstances. Even if the accused does not perceive any government coercion in that moment, it may still be inferred that the accused's silence is motivated not by guilt or tacit admission but by the intent to simply heed the advice of counsel. To permit a jury to draw an adverse inference under these circumstances would impose a "penalty" for "exercising a constitutional privilege," which *Griffin* prohibits. (*Griffin, supra*, 380 U.S. at p. 614.) In short, we see no reason why even in an ostensibly private conversation such as a pretext call, an accused's express invocation of the

right to remain silent on the advice of counsel in response to an accusation of crime should not enjoy Fifth Amendment protection under *Griffin*.[9]

The People further maintain there was no *Griffin* error in this case because the prosecutor's statements and questions constituted valid comments on the state of the evidence, not on Nguyen's failure to testify. We are not persuaded. *Griffin* error may occur indirectly, such as when a prosecutor is permitted to comment on "the absence of evidence that only the defendant's testimony could provide." (*Brady*, *supra*, 50 Cal.4th at pp. 565–566.) Here, the prosecutor repeatedly commented on something only Nguyen could provide: a denial to Doe's rape accusations.

Having concluded Fifth Amendment protection is not categorically inapplicable due to the absence of coercion, we must now assess whether its protections apply in light of all the circumstances. To reiterate, *Griffin* prohibits prosecutorial comment "on an accused's invocation of the constitutional right to silence." (*People v. Lewis* (2001) 25 Cal.4th 610, 670.) To invoke the right to remain silent, " 'no particular form of words or conduct is necessary on the part of a suspect, . . . and the suspect may invoke this right by any words or conduct reasonably inconsistent with a present willingness to discuss the case freely and completely." (*People v. Samayoa* (1997) 15 Cal.4th 795, 829.) An accused may waive the right to remain silent (*People v. Williams* (2010) 49 Cal.4th 405, 425), but then later reinvoke the right, so long as they do so unambiguously. (See *People v. Henderson* (2020) 9 Cal.5th 1013, 1022.) Whether an accused has indeed invoked the Fifth

---

[9]     We express no opinion on whether the rule of *Griffin* should apply where no express invocation of the Fifth Amendment right to remain silent is made during the pretext call, or for that matter, what foundational evidence would be necessary in such circumstances for Fifth Amendment protection to potentially apply.

Amendment right "is a question of fact to be decided in the light of all the circumstances." (*People v. Hayes* (1985) 38 Cal.3d 780, 784–785.)

We conclude the circumstances here, when viewed in their totality, do not "lend themselves to an inference that [Nguyen] was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution" during the pretext call. (*Riel, supra*, 22 Cal.4th at p. 1189.) True, Nguyen advised Doe prior to the call that he was not permitted to talk to her and might choose "not to answer the question" out of concern the message might be "screenshotted" and shared. But this remark, reasonably construed, pertained to Nguyen's initial reluctance to put his responses in writing. After receiving Doe's questions in advance, Nguyen said he would call if he was "able and comfortable enough to answer," and Nguyen did, in fact, call soon thereafter. The two then engaged in a lengthy conversation during which Nguyen not only apologized for hurting Doe but affirmatively said he "did" think about the "rape incident." These were not, as Nguyen testified, merely "superficial" remarks consistent with maintaining the right of silence. Although Nguyen later reiterated during the call that he was not "allowed to talk to [Doe]" and had been advised by an attorney that "anything I say can be used as evidence to turn around on me," he nevertheless engaged in further conversation, saying the reason he agreed to do so was because he had accepted and come to terms with the things he had done to her. Viewed in context, Nguyen's words and actions were not reasonably consistent with invoking the right to remain silent. His brief moments of wariness and his ancillary remarks about counsel's advice were not enough to invoke Fifth Amendment protection given his overall discussions with Doe. In short, this was a voluntary call during which Nguyen, though apparently mindful of his counsel's advice to assert his Fifth Amendment privilege against self-

incrimination, simply chose not to heed it. Accordingly, we conclude the rule of *Griffin* did not bar the prosecution from commenting on Nguyen's silences and nondenials or prohibit the trial court from admitting the pretext call evidence and instructing the jury on adoptive admissions.

### D. Restitution

At sentencing, the trial court ordered Nguyen to pay Doe $6,511.54 in restitution as requested by the People's sentencing brief. This amount was based on Doe's restitution claim submitted to Victim Services, in which she itemized the requested expenses as follows: $450 in "ER/Hospital Visits"; $3,496 for "Psych Appointment Co-Pay"; $970.65 in "Medication"; $1,552.11 for "Trip in 2018 that he agreed to pay during the Pre-Text Call"; and $42.18 for "Ubers the day he raped me." Nguyen argues the trial court abused its discretion in awarding restitution in these amounts because the losses were unrelated to the charged crime. We agree in part.

"It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." (§ 1202.4, subd. (a)(1).) Thus, where a criminal defendant is convicted of a crime, the trial court "shall" order the defendant to pay "[r]estitution to the victim or victims, if any, in accordance with subdivision (f)." (§ 1202.4, subd. (a)(3)(B).) Under section 1202.4, subdivision (f), "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." The restitution order "shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every

41

determined economic loss incurred as the result of the defendant's criminal conduct," and may include such costs as medical expenses, mental health counseling expenses, wages or lost profits due to injury, and relocation expenses. (§ 1202.4, subd. (f)(3)(B), (C), (D), and (I).)

The trial court's "discretion in setting the amount of restitution is broad, and it may use any rational method of fixing the amount of restitution as long as it is reasonably calculated to make the victim whole." (*People v. Baker* (2005) 126 Cal.App.4th 463, 470.) The hearing to establish the amount of restitution " ' "does not require the formalities of other phases of a criminal prosecution" ' " (*ibid*.), and no particular kind of proof evidence is required (*People v. Lockwood* (2013) 214 Cal.App.4th 91, 96).

That said, the trial court's discretion to order direct victim restitution is not limitless, as section 1202.4 authorizes restitution only for economic losses incurred "as a result of" the defendant's criminal conduct. As the Supreme Court has explained, the restitution power conferred by section 1202.4 in cases where a criminal defendant is sentenced to prison is not as broad as the court's power to order restitution as a condition of probation, which need only be reasonably related to the crime of which the defendant was convicted or to future criminality. (*People v. Martinez* (2017) 2 Cal.5th 1093, 1101 (*Martinez*).)

In *Martinez*, the defendant pleaded guilty to leaving the scene of an injury accident and was ordered to pay $425,654.63 to the victim for injuries sustained in the collision. (*Martinez*, *supra*, 2 Cal.5th at p. 1099.) The Supreme Court reversed the restitution order, concluding the trial court lacked the power to order restitution for the victim's injuries because the defendant's criminal conduct in leaving the scene did not cause the accident or the victim's resulting injuries. (*Martinez*, at p. 1098.) Though section

42

1202.4 authorized "restitution for those injuries that were caused or exacerbated by defendant's criminal flight from the scene of the accident," it did not authorize "restitution for injuries resulting from the accident itself." (*Ibid.*)

Mindful of these principles, we have no difficulty concluding the $1,552.11 in expenses from the 2018 Asia trip was not an economic loss incurred "as a result of" the August 2019 rape. The People concede as much.

Regarding the $3,496 "Psych Appointment Co-Pay," Nguyen contends this expense was not an economic loss resulting from the August 2019 rape, but was instead related to Doe's mental breakdown and five-day hospitalization in April 2018. He likewise argues the $450 for "ER/Hospital Visits" relates, at least in part, to the April 2018 hospitalization. As for the $970.65 in "Medication," Nguyen attributes this to Doe's references in the record to STI medication and argues these expenses were not causally related to the charged offense because Doe contracted chlamydia in August 2018 (a year before the rape) and November or December 2019 (several months after the rape).

We are not persuaded the trial court erred in awarding restitution of these amounts. As Nguyen acknowledges, Doe's testimony at the sentencing hearing described the mental anguish she had suffered, including depression, anxiety, and post-traumatic stress disorder, along with the physical impact of the "stress of upcoming court dates" that sent her "to the ER because [her] abdominal pain was so bad that [she] could not stand." Doe further stated that she had "been consistently going to therapy every week for the last few years" and that she was taking "medication everyday to combat the symptoms of [her] mental illness." Doe's statements provided a sufficient factual basis for the court to conclude, within the appropriate exercise of its

discretion, that the expenses Doe incurred for psychiatric treatment, emergency room hospitalization, and medication were economic losses resulting from Nguyen's criminal conduct. That Doe had preexisting mental health issues prior to her relationship with Nguyen is of no consequence, as the court was authorized to award restitution for injuries "caused or *exacerbated*" by Nguyen's crime. (*Martinez*, *supra*, 2 Cal.5th at p. 1098, italics added.)

Finally, we agree with Nguyen that the trial court erred in awarding $42.18 for Doe's rideshare expenses. Although a relatively small amount, the expense lacks the degree of causation required for awarding section 1202.4 restitution. Doe identified this expense as having been incurred for "Ubers the day he raped me." But a mere subject matter or temporal relationship between the expense and the crime is not necessarily sufficient; the economic loss must have been incurred "as a result of" the crime. Here, the only evidence in the record regarding Doe's transportation expenses was her testimony that she used the Uber rideshare service to get "to" Nguyen's home prior to the rape. This was not an expense incurred "as a result of" the rape, and there was no other testimony or evidence about rideshare costs incurred after the rape, let alone as a result of it.

In sum, we conclude the restitution award must be reduced by $1,552.11 for the Asia trip expenses and $42.18 for the rideshare expenses.

<h3 style="text-align:center">DISPOSITION</h3>

The judgment is modified by reducing the restitution award to $4,917.25. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting the modification and send the amended abstract to the Department of Corrections and Rehabilitation.

_____

Fujisaki, Acting P. J.

WE CONCUR:


_____

Petrou, J.


_____

Rodríguez, J.

*People v. Nguyen* (A170809)